THE STATE OF OHIO, APPELLEE, *v.* WILLIAMS, APPELLANT.

[Cite as *State v. Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164.]

(No. 1999–1878—Submitted April 15, 2003—Decided August 27, 2003.)

O'CONNOR, J.

{¶ 1} In the early morning of February 18, 1999, defendant-appellant, Robert Williams Jr., entered the home of Velma McDowell, who lived in Apartment 12 at Glendale Terrace, a senior-citizens residential complex in Toledo. Once inside, Williams raped and strangled Velma, who was 88 years old. Then, he stole $300 from her purse. Police apprehended Williams, and a jury convicted him of rape, aggravated robbery, aggravated burglary, and aggravated murder. Following a penalty hearing, the trial court sentenced Williams to death.

{¶ 2} In this appeal, Williams raises 20 propositions of law. Finding none meritorious, we affirm his convictions. We have independently weighed the aggravating circumstances against the mitigating factors and compared Williams's sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm defendant's convictions and sentence of death.

{¶ 3} *Prosecution evidence.* On the evening of February 17, 1999, Troy Presnell and Williams were visiting at the home of Presnell's mother, who lived in Apartment 3 at Glendale Terrace. Williams and Presnell left in order to panhandle, and then they drank and shot pool at a local bar. Presnell paid for the drinks because he thought Williams had no money.

{¶ 4} Around 12:00 a.m., February 18, Williams and Presnell returned to Apartment 3 at Glendale Terrace. Shortly thereafter Williams left again. Wanda Richards, who also lived at Glendale Terrace, saw Williams leave Apartment 3 around 12:00 a.m. When Williams came out, he looked at Richards, who was in a wheelchair, and asked her if she was watching him walk up and down the hall.

After Richards replied that she was on her way home, Williams offered to "push [her] home." Richards declined, stating that she had to go home quickly and call a friend or someone would come looking for her.

{¶ 5} Around 12:20 a.m., Williams came back to Apartment 3 and showed Presnell between $400 and $500, which he shared with Presnell. When he did so, Williams remarked, "[T]his is how you panhandle." The next day, Williams told Presnell that he had bought a car.

{¶ 6} That morning, around 9:00, February 18, Shirley Green, Velma's younger sister, discovered Velma's body in Velma's apartment. She was lying on the bed sideways. Her body was naked, and her legs were spread. Green, the police, and emergency medical personnel initially believed that Velma had died of natural causes. Green noticed that the door to Velma's apartment was locked, which was unusual because Velma normally kept that door unlocked. Velma's purse was in the apartment and had $1,100 in it.

{¶ 7} Later that same morning, Dr. Diane Scala–Barnett, deputy coroner, examined Velma's body, concluded that she was a homicide victim, and notified police. Dr. Scala–Barnett observed bruises on Velma's eye, ear, left cheek, mouth, jaw, wrist, left breast, and foot. Dr. Scala–Barnett found bruises on Velma's vagina, which was filled with blood.

{¶ 8} Dr. Scala–Barnett also found that a cloth had been stuffed into Velma's mouth. Dr. Scala–Barnett noted that one would not voluntarily stuff a rag into one's own mouth. Dr. Scala–Barnett found a human hair on the rag that was later determined to be a "Negroid pubic hair." Velma was a Caucasian. Dr. Scala–Barnett concluded that the rag did not cause Velma to suffocate; instead, she "died of asphyxia due to ligature strangulation." The strangulation marks were consistent with having been caused by a bloodied pair of women's hose found inside the entrance to Velma's apartment.

{¶ 9} When police officers examined Velma's apartment that afternoon, they found no signs of forced entry; however, detectives discovered a latent palm print and a fingerprint identified as Williams's in the hallway and on the molding of the entry door leading into Velma's apartment.

{¶ 10} In Velma's bedroom, forensic technicians found Velma's blood on the carpet beside her bed and on a bed pillow. Technicians found other stains on Velma's bed, on the rug beside the bed, and on a tissue found in the bathroom. These stains fluoresced under alternate lighting, indicating the presence of a bodily fluid, i.e., semen. On the basis of an initial DNA test, an expert concluded that the DNA type found in the semen stains matched Williams's DNA and occurs in one of 90,100 Caucasians, one of 5,680 African–Americans, and 1 of 22,200 Hispanics. Another DNA expert, who conducted more sophisticated DNA tests, testified that the DNA in the semen from Velma's apartment, identical to

Williams's DNA, was found in only one of 5.4 quadrillion Caucasians and one of 156 quadrillion African–Americans.

{¶ 11} On the morning of February 22, police went to the home of Williams's ex-wife to question him about Velma's death. When the police car drove up, Williams ran away. Police Sergeant Steve Forrester chased him on foot for 30 minutes. At one point, Forrester drew his weapon and cornered Williams, who responded, "Fuck it, just shoot me." Williams then evaded Forrester, but two uniformed police officers later apprehended him.

{¶ 12} At the police station, police interviewed Williams after advising him of his *Miranda* rights, and after Williams signed a waiver of those rights. For 30 to 40 minutes, Williams described his activities on February 17 and 18 and denied that he was involved in Velma's death.

{¶ 13} The police paused the interview and took photographs of a cut on Williams's hand, possibly caused by stuffing the rag down Velma's throat. After these photographs were taken, Police Lieutenant Charles Hunt, who had not previously interviewed Williams, questioned Williams. Lt. Hunt told Williams that the police knew that he was guilty, that he was going to be charged with murder, that police had found his fingerprints and semen in Velma's apartment, and that witnesses had seen Williams flashing money that he did not have before. When confronted with these facts, Williams responded, "I told her not to put that rag in her mouth."

{¶ 14} Williams asserted to police that he and Velma voluntarily had sex three or four times over the previous two weeks. Williams claimed that on the night that she died, he stopped by her apartment, and she invited him in and asked him if he wanted to have sex with her. According to Williams, Velma placed the cloth rag over her mouth while they were having sex to muffle her sounds of pleasure and screaming. When Williams noticed that she was gagging, he panicked and left the apartment.

{¶ 15} Then, Lt. Hunt confronted Williams with the fact that Velma had not choked to death but was strangled. In response, Williams stated that he had returned to the apartment and strangled Velma with a pair of pantyhose to make it appear as if a stranger had killed her. Williams continued to deny that he had stuffed the cloth in her mouth. He admitted, however, that he had ejaculated on the floor near her bed and that he had taken $300 from her purse.

{¶ 16} That afternoon, Williams was booked into the Lucas County Jail, where a nurse obtained a blood and a DNA sample from him. While the nurse took the blood sample, Williams "made a couple of statements to himself." Williams stated, "My dick got me in trouble" and "I ought to cut it off." Shortly thereafter, Williams said, "I guess I won't be screwing any more old ladies." At

the time, no police officers were questioning Williams. He blurted out these statements on his own volition and to no one in particular.

{¶ 17} *Defense evidence.* Williams presented testimony from Toledo Detective Vince Mauro, who confirmed that when Velma's body was discovered on the morning of February 18, her sister and the police thought that Velma had died from natural causes. Hence, police did not secure Velma's apartment as a crime scene until after 1:00 p.m. However, Mauro did not believe that the delay in securing the crime scene compromised the investigation.

{¶ 18} *Trial result.* A grand jury indicted Williams in Count One for aggravated felony-murder with three death penalty specifications charging murder during rape (specification 1), murder during an aggravated robbery (specification 2), and murder during a burglary (specification 3). The grand jury also indicted Williams in Count Two for rape, in Count Three for aggravated burglary, and in Count Four for aggravated robbery. The jury found Williams guilty as charged. Following a penalty hearing, the jury recommended the death penalty. The trial court sentenced Williams to death on Count One and to consecutive prison terms on each remaining count.

{¶ 19} Williams now appeals directly to this court as a matter of right.

### Suppression of pretrial confession

{¶ 20} In proposition of law I, Williams argues that the trial court erred in declining to suppress his pretrial confession because police violated his Fifth, Sixth, and Fourteenth Amendment rights and his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. At a pretrial hearing to consider the suppression issues, the following facts were established.

{¶ 21} On February 22, 1999, when police arrested Williams, after a 30-minute chase, he was screaming, cursing, and struggling to get free. At the scene of the arrest, Alan[1] Penamon, an attorney, approached Sgt. Forrester and told him that he was an attorney. Penamon also told Forrester, "I don't want you to take a statement from [Williams] until I talk with him." Forrester replied that it was up to Williams to invoke his *Miranda* rights, but police did not question Williams at the scene.

{¶ 22} When police placed Williams in the police van, he "was struggling * * * [and] was yelling 'Allen.'" At the suppression hearing, defense counsel asked Forrester, "Did you hear Robert Williams yell, 'that's my attorney Allen[?]'" and Forrester replied, "Uh-huh." Sgt. Forrester believed that Williams was Penamon's client. In contrast, Detective Vincent Mauro, who was also at the scene, "wasn't fully convinced that [Penamon] was his attorney in this case." However,

---

1. Alternatively, Allen or Allan in the record.

Williams told Mauro that he was "trying to get to his lawyer to bring him down to [the police station] or to the Safety Building."

{¶ 23} Because neither Penamon nor Williams testified, the record does not establish the exact relationship between them. At one point, Williams described Penamon as "just a friend," but Williams also referred to Penamon as his lawyer. The record does not reveal how Penamon happened to be at the scene of the arrest, although Williams claimed that Penamon was going to accompany him to the station.

{¶ 24} After police had taken Williams to the police station, Penamon went to the visitors' area at the police station and asked to talk with Williams. Neither Lt. Hunt nor Sgt. Forrester, the responsible officers at the station, immediately responded. Lt. Hunt stated that approximately 10 to 15 minutes after he knew that Penamon was there, he went to see what Penamon wanted. But Penamon had already left. Also, when Forrester went to see Penamon at the visitors' area, Penamon had already left. The evidence does not indicate that police told Williams that Penamon had come to the station and had asked to talk with him.

{¶ 25} At the station, Detectives Bart Beavers and Mauro advised Williams of his *Miranda* rights. Williams orally waived his rights and signed a waiver of those rights at 8:50 a.m. Williams did not ask to see Penamon or any other lawyer, decline to answer questions, or invoke his right to remain silent. At the beginning of the interview, Williams asked why the police had chased away his lawyer when he was arrested on the street. Detective Mauro responded that they would not discuss the case on the street and that Penamon was informed that if he needed to talk to Williams, they were going to take him to the station. At the end of police questioning, Williams stated that Penamon was a lawyer-friend who was going to accompany him to the police station. When asked to clarify this, Williams stated that Penamon was "just a friend."

{¶ 26} When Beavers and Mauro interviewed Williams, he freely answered questions and, over the course of 30 or 40 minutes, described his activities the night of the murder. Williams's account included his panhandling, his drinking, and his presence at the Glendale Terrace complex. He denied, however, any involvement in Velma's death. Police videotaped the advisement and waiver of rights and the interview.

{¶ 27} Following approximately a 30-minute pause in the interview, Lt. Hunt became involved. After Lt. Hunt told Williams that the police could prove his guilt with DNA and fingerprint evidence, Williams reportedly said, "I told her to get that rag out of her face." Lt. Hunt then verified that the police had resumed videotaping the interview, and Williams confessed to killing Velma.

{¶ 28} First, we reject Williams's claim that his waiver of *Miranda* rights was involuntary and that he "invoked, through counsel, both his Fifth Amendment

right to be silent and his right to counsel under the Sixth Amendment." We also reject Williams's claim that his confession was inadmissible.

{¶ 29} The Fifth Amendment right against self-incrimination is a personal right "that can only be invoked by the individual whose testimony is being compelled." *Moran v. Burbine* (1986), 475 U.S. 412, 433, 106 S.Ct. 1135, 89 L.Ed.2d 410, fn. 4 (during interrogation, police rebuffed attorney who had been hired by a Mirandized suspect's sister, where suspect had not requested assistance of counsel). Accord *State v. Benner* (1988), 40 Ohio St.3d 301, 310, 533 N.E.2d 701; *State v. Carder* (1966), 9 Ohio St.2d 1, 7, 38 O.O.2d 1, 222 N.E.2d 620 ("The determinative factor * * * is the desire of the accused to consult with counsel, not the desire of counsel to consult with the accused"). See, also, *Ajabu v. Indiana* (Ind.1998), 693 N.E.2d 921, 932, 96 A.L.R.5th 669 (*Miranda* does "not give a lawyer control over the interrogation unless the suspect requests it").

{¶ 30} Penamon, even as an attorney, could not invoke Williams's Fifth Amendment rights because such rights are personal to Williams. This principle is true even though Penamon had asked police not to question Williams and later went to the police station and asked to talk with Williams.

{¶ 31} Further, we hold that the police never violated Williams's Sixth Amendment right to counsel. "[T]he Sixth Amendment right to counsel does not attach until after the initiation of formal charges." *Moran,* 475 U.S. at 431, 106 S.Ct. 1135, 89 L.Ed.2d 410. Accord *Davis v. United States* (1994), 512 U.S. 452, 456, 114 S.Ct. 2350, 129 L.Ed.2d 362; *State v. DePew* (1988), 38 Ohio St.3d 275, 278, 528 N.E.2d 542.

{¶ 32} Third, the police could not violate Williams's Fifth Amendment right to consult an attorney, because Williams never unambiguously invoked his right to counsel, as the United States Supreme Court required in *Davis v. United States* (1994), 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362. In *Davis,* the court declined to extend *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, which held that, when a defendant invokes his right to counsel, police must cease interrogation until his counsel is present. Specifically, the *Davis* court declined to "require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." *Davis,* 512 U.S. at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362. Instead, *Davis* holds that "the suspect must *unambiguously* request counsel. * * * [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." (Emphasis added.) Id.

{¶ 33} Although Williams shouted Penamon's name when arrested, he was ranting, cursing, and resisting arrest at the time. Williams never specifically asked to see Penamon, and we do not know why he shouted his name. Thus, the facts do not clearly establish an unequivocal request to see counsel when police arrested Williams.

{¶ 34} During the police interview at the station, Williams did not ask to consult either Penamon or any other attorney before or after he voluntarily signed the waiver of his rights. Moreover, Williams never asked to see Penamon even though Williams knew that Penamon had observed the police arrest him. At the station, he described Penamon as "just a friend" who was going to accompany him to the station. Williams's brief complaint about the police chasing away Penamon when Williams was arrested did not constitute a request to consult with Penamon. Our review of the videotape shows that this was clearly a parenthetical remark. See, e.g., *Mueller v. Angelone* (C.A.4, 1999), 181 F.3d 557, 573 (defendant's question to police, "Do you think I need an attorney here?" answered by a shrug and the statement, "You're just talking to us" was not an unequivocal request); *Dormire v. Wilkinson* (C.A.8, 2001), 249 F.3d 801 ("Could I call my lawyer," followed by police response "yes," without more, did not invoke the right to counsel); *United States v. Zamora* (C.A.10, 2000), 222 F.3d 756, 766 ("I might want to talk to an attorney" was not "an unequivocal request for counsel"). See, also, *State v. Murphy* (2001), 91 Ohio St.3d 516, 521, 747 N.E.2d 765 ("I'm ready to quit talking now and I'm ready to go home, too" was not "an unequivocal assertion of his right" to remain silent); *State v. Henness* (1997), 79 Ohio St.3d 53, 62–63, 679 N.E.2d 686 ("I think I need a lawyer" is not an unequivocal assertion of right to counsel).

{¶ 35} Fourth, we hold that the police had no obligation to tell Williams that Penamon had come to the station, and their failure to do so did not render Williams's statement involuntary. The United States Supreme Court has rejected any per se requirement that "the police inform a suspect of an attorney's efforts to reach him." *Moran*, 475 U.S. at 425, 106 S.Ct. 1135, 89 L.Ed.2d 410. In declining to establish such a rule, the Supreme Court noted: "While such a rule might add marginally to *Miranda*'s goal of dispelling the compulsion inherent in custodial interrogation, overriding practical considerations counsel against its adoption. As we have stressed on numerous occasions, '[o]ne of the principal advantages' of *Miranda* is the ease and clarity of its application." Id., quoting *Berkemer v. McCarty* (1984), 468 U.S. 420, 430, 104 S.Ct. 3138, 82 L.Ed.2d 317.

{¶ 36} Here, the record supports the trial court's conclusion that Williams freely and voluntarily waived his *Miranda* rights and that he voluntarily confessed. The videotape shows that the police fully advised Williams of his *Miranda*

rights, and that he acknowledged and waived those rights orally and in writing. The police never threatened or intimidated Williams, and they did not coerce his decision to waive counsel or his *Miranda* rights. As we held in *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 437 N.E.2d 583, "[T]he weight of the evidence and credibility of witnesses are primarily for the trier of the facts. * * * This principle is applicable to suppression hearings as well as trials." Accord *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus; *DePew*, 38 Ohio St.3d at 277, 528 N.E.2d 542; *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972.

{¶ 37} Additionally, we find that other compelling evidence established Williams's guilt, and that any error arising from admitting his confession was harmless beyond a reasonable doubt. See *Arizona v. Fulminante* (1991), 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (improper admission of involuntary confession subject to "harmless error" analysis). Two eyewitnesses, Presnell and Richards, placed Williams in the vicinity of the murder, and Presnell described Williams suddenly turning up after midnight with $400 to $500. Additionally, Williams later blurted out, when blood and DNA samples were taken from him at the county jail, "my dick got me in trouble" and "I guess I won't be screwing any more old ladies." Police were not questioning Williams at the time, and the admissibility of these volunteered admissions was not affected by any issue relating to the confession. See *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473.

{¶ 38} Moreover, investigators found overwhelming evidence of Williams's presence in Velma's apartment. Williams's fingerprints were on Velma's doorway, his semen was smeared on her bed and the nearby rug, as well as in the bathroom, and a pubic hair belonging to an African–American was found on the rag stuffed in her mouth. Finally, an expert testified that the *odds that the DNA in the semen belonged to an African–American other than Williams were 156 quadrillion to one.*

{¶ 39} Thus, we reject Williams's proposition of law I.

### Prosecutorial misconduct

{¶ 40} In proposition of law II, Williams argues that prosecutorial misconduct denied him a fair trial. Our review of the record reveals that either no prejudicial error attached to the alleged misconduct, or Williams waived all but plain error by failing to object at trial. See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Under the plain-error doctrine, reversible error occurs only if "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 41} *Voir dire.* Williams argues that, during voir dire, the prosecutor, in effect, forced him to present evidence by explaining to the jury that when the case is tried, "[t]he state is required to * * * present all our evidence first. Then the defense presents their evidence." Williams, however, failed to object, thereby waiving all but outcome-determinative plain error. Even assuming that the prosecutor's straightforward explanation of trial sequence amounted to error, we reject Williams's argument because such innocuous statements could not conceivably have influenced the trial verdict rendered days later. See, e.g., *State v. Campbell* (1994), 69 Ohio St.3d 38, 51, 630 N.E.2d 339. See, also, *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431; *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068.

{¶ 42} *Prosecutor's trial-phase opening.* Williams complains that the prosecutor in his opening statement referred to the victim as a wife, a widow, a grandmother, a great-grandmother, a friend, and a sister, and briefly described how her younger sister helped Velma in her activities.

{¶ 43} Again, Williams did not object, and any conceivable error did not affect the outcome of the trial. The prosecutor simply foreshadowed relevant testimony that helped explain the sister's presence in the house and her relationship with her sister. As we have previously noted, the "circumstances of the victims are relevant to the crime as a whole. The victims cannot be separated from the crime." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212.

{¶ 44} *Closing trial-phase argument.* Williams claims that the prosecutor's trial-phase argument was improper because the prosecutor asserted his personal opinion about what the evidence showed. A prosecutor's remarks constitute misconduct if the remarks were improper and if the remarks prejudicially affected an accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Accord *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293. The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 45} Admittedly, during the state's closing argument the prosecutor improperly referred to his personal opinion when he argued what the evidence showed. The following illustrates: "I don't think that's a question"; the witness "didn't appear to me * * * to have a problem"; "I think he shoved [the rag] down her throat"; "How do I know he held [the ligature]"; "He wants you to believe * * *; I don't think so."

{¶ 46} At times, Williams preserved the issue by objections, and the court directed the prosecutor to rephrase the argument. Nonetheless, we find no prejudicial error in the record. Here, the record simply reveals a prosecutor who failed to appreciate that he should not say, "I think" or "I believe" before

asserting what the evidence proved. In each instance, the prosecutor simply argued what the evidence established either directly or by fair inference. "A prosecutor may state his opinion if it is based on the evidence presented at trial." *State v. Watson* (1991), 61 Ohio St.3d 1, 10, 572 N.E.2d 97, citing *State v. Tyler* (1990), 50 Ohio St.3d 24, 41, 553 N.E.2d 576. Moreover, the absence of prejudice is demonstrated by the compelling evidence of guilt, including Williams's confession, the DNA evidence, and the fingerprint evidence.

{¶ 47} Further, the prosecutor did not err by claiming that Williams used stealth to enter into Velma's apartment, nor did Williams preserve that issue by an objection. The evidence established that Velma kept her doors unlocked, and no signs of forced entry existed. Moreover, Williams's claim that he had an ongoing sexual relationship with Velma, and that she voluntarily allowed him entry, lacks credibility. Entry by stealth is a logical inference. "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom." *State v. Richey* (1992), 64 Ohio St.3d 353, 362, 595 N.E.2d 915.

{¶ 48} ***Penalty phase.*** Williams also complains about the prosecutor's conduct during the penalty phase. Again, Williams did not object at trial and thus waived all but plain error. We find no plain error or prosecutorial misconduct during the penalty phase.

{¶ 49} The prosecutor's comment that rape is a more serious aggravating circumstance than burglary constituted fair comment. We have remarked that certain aggravating circumstances may be more grave or serious than others. See, e.g., *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 129. Moreover, the prosecutor could quite legitimately compare the aggravating circumstances with the mitigating evidence presented by Williams. "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292.

{¶ 50} Also, by referring to the facts of the aggravating circumstances, the prosecutor did not convert those facts into aggravating circumstances. "The facts [of an offense] are relevant in determining whether the nature and circumstances of the offense are mitigating." *State v. Green* (2000), 90 Ohio St.3d 352, 374, 738 N.E.2d 1208, citing *Lorraine*, 66 Ohio St.3d at 420, 613 N.E.2d 212. Moreover, as we have noted, "both the criminal *and his crime* are properly considered in determining the propriety of imposing a death sentence." (Emphasis sic.) *Hill*, 75 Ohio St.3d at 200, 661 N.E.2d 1068, quoted in *Green*, 90 Ohio St.3d at 374, 738 N.E.2d 1208.

{¶ 51} Nor did the prosecutor commit misconduct by noting that Williams had violated the sanctity of Velma's home "where she laid down at night for rest

* * * [believing] that she could do that safely." Aggravated burglary was a specified aggravating circumstance. Further, the prosecutor's brief comment was not comparable to the long speculative description of mental anguish and suffering that we condemned in *State v. Combs* (1991), 62 Ohio St.3d 278, 282–283, 581 N.E.2d 1071.

{¶ 52} In sum, Williams received a fair trial, and prosecutorial misconduct did not affect the trial result. Further, Williams received an objective, fair, and individualized sentencing determination. Accordingly, we reject proposition of law II.

### Speedy trial/effective assistance of counsel

{¶ 53} In proposition of law III, Williams argues that his constitutional rights were violated because the trial court required him to choose between his right to a speedy trial and his desire to have different counsel appointed to represent him.

{¶ 54} At a pretrial hearing on July 16, 1999, Williams complained about his lawyers and the court's refusal to suppress his confession; then he asserted, "I don't want to have these lawyers [because] they are not helping me." The court asked Williams: "[D]o you understand if you were appointed new counsel * * * [the court] would have no choice but to continue the trial date [of] * * * August 9, [1999]." The court expressly stated that it would appoint new counsel if Williams desired. Williams, however, when faced with the need to waive his right to a speedy trial and to sign a waiver, changed his mind and stated, "Yes, I [will] keep my lawyers. I won't sign the waiver. * * * I'm going to die anyway might as well keep them." Later, Williams reaffirmed his desire to retain his current representation.

{¶ 55} We find that the trial court acted within its discretion in requiring Williams to choose between retaining his counsel and having his case delayed. First, Williams never demonstrated that the trial court was required to appoint new counsel. At trial, Williams complained that his attorneys failed to have his confession suppressed; however, Williams did not establish a complete breakdown in communications with counsel or "good cause" to substitute counsel. Cf. *State v. Cowans* (1999), 87 Ohio St.3d 68, 72, 717 N.E.2d 298. In fact, the court advised Williams that his counsel, thus far, had performed well in the suppression hearing. The record also suggests that counsel competently represented Williams. In any event, Williams ultimately abandoned his demand for different counsel even though the trial court had agreed to substitute counsel.

{¶ 56} Second, the trial court carefully explained Williams's choices to him when it asked him to choose between new counsel, thereby delaying the trial, and proceeding to trial with his present counsel. Respect for an individual's rights requires that he or she be given a choice as to crucial trial issues. As Williams

noted at this hearing, "This is my life. I'm going to be the individual in the penitentiary for 10 years before you all decide to kill me." As we recognized in *State v. Berry* (1997), 80 Ohio St.3d 371, 686 N.E.2d 1097, a criminal defendant may decide how his case will proceed. "A competent criminal defendant may plead guilty to a charge even though he believes himself to be innocent. He may testify on his own behalf, or refuse to do so, against the advice of counsel. He may choose to do without counsel altogether, and represent himself. However wise or foolish his decisions, they are his." (Citations omitted.) Id. at 384–385, 686 N.E.2d 1097.

{¶ 57} Thus the trial court did not err by allowing Williams to proceed as he wanted. The trial court simply acted " 'out of "that respect for the individual which is the lifeblood of the law." ' " *Tyler*, 50 Ohio St.3d at 29, 553 N.E.2d 576, quoting *Faretta v. California* (1975), 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562, and *Illinois v. Allen* (1970), 397 U.S. 337, 350–351, 90 S.Ct. 1057, 25 L.Ed.2d 353 (Brennan, J., concurring).

{¶ 58} Moreover, if the court had appointed new counsel and forced that counsel to trial on August 9, as Williams wanted, counsel might well have lacked adequate time to prepare. Alternatively, forcing existing counsel to waive Williams's right to a speedy trial, in the face of Williams's vehement objection, would have been inappropriate. Thus, we reject proposition of law III as lacking merit.

### Competency to stand trial (IV, V)

{¶ 59} In proposition of law IV, Williams contends that the trial court erred by not finding him incompetent to stand trial because "he was unable to assist in his own defense." In his related proposition of law V, Williams argues that his trial attorneys rendered ineffective assistance because they did not ask for a competency hearing or psychiatric evaluation to determine his competency to stand trial.

{¶ 60} Admittedly, "a person * * * [who] lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri* (1975), 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103. "Fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial." *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, citing *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815.

{¶ 61} The relevant statute, R.C. 2945.37(B), requires a competency hearing if a request is made before trial. That section also specifies that "[i]f the issue is raised after the trial has commenced, the court shall hold a hearing on the issue

only for good cause shown." Thus, we have recognized that "the decision as to whether to hold a competency hearing once trial has commenced is in the court's discretion." *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 492 N.E.2d 401. "The right to a hearing * * * rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence,' such that an inquiry * * * is necessary to ensure the defendant's right to a fair trial." *Berry*, 72 Ohio St.3d at 359, 650 N.E.2d 433, citing *Drope* and *Pate*, supra.

{¶ 62} Contrary to Williams's claims, we find that the record in this case reveals no "indicia of incompetence" that would require a competency hearing. First, although Williams argues that he was unable to assist his attorneys at trial and was therefore incompetent, he fails to cite *anything* in the record that supports this claim. To the contrary, the record reveals that Williams expressed his views throughout the proceedings and understood the nature of the proceedings and his rights. Moreover, "[a] defendant is presumed to be competent to stand trial." R.C. 2945.37(G). We must give deference on these issues to those "who see and hear what goes on in the courtroom." *Cowans*, 87 Ohio St.3d at 84, 717 N.E.2d 298.

{¶ 63} Second, if counsel had some reason to question his competence, they would have done so. See *State v. Spivey* (1998), 81 Ohio St.3d 405, 411, 692 N.E.2d 151. Counsel represented Williams from March 1999 until August 1999. During that time, counsel discovered no basis to question Williams's competence. Moreover, Williams displayed no outrageous, irrational behavior during trial, and counsel never.complained about his lack of cooperation. "[I]t is noteworthy that *nobody* on the spot thought [the defendant's] behavior raised any question as to his competence." (Emphasis sic.) *Cowans*, 87 Ohio St.3d at 84, 717 N.E.2d 298. Accord *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 38; *State v. Hessler* (2000), 90 Ohio St.3d 108, 125, 734 N.E.2d 1237.

{¶ 64} Third, Dr. Christopher Layne, a defense psychologist, examined Williams and did not question his competency to stand trial. Dr. Layne testified that Williams had mental problems and an antisocial personality but did not have organic brain damage. In defense exhibit A, Dr. Layne specifically found that Williams was competent to stand trial. Moreover, we have recognized that the "term 'mental illness' does not necessarily equate with * * * legal incompetency." *Berry*, 72 Ohio St.3d 354, 650 N.E.2d 433, syllabus. "A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016. In this case, the trial court had no basis to find Williams incompetent to stand trial. Hence, we find that proposition of law IV lacks merit.

{¶ 65} By the same reasoning applied to proposition of law IV, we reject proposition of law V, which claims ineffective assistance of counsel. Counsel knew their client and could best determine whether he was able to assist them in his defense or whether a competency hearing or psychiatric examination was needed. Counsel already had extensive past psychological evaluations of Williams as well as Dr. Layne's recent evaluation.

{¶ 66} Counsel's decision not to pursue further evaluations reflected a reasonable professional judgment. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington* (1984), 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Moreover, nothing in the record suggests prejudice. Specifically, a reasonable probability does not exist that if further evaluations had been held, the result would have been different. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

### Opinion by expert witness (VI, VII)

{¶ 67} In proposition of law VI, Williams argues that the trial court erred in allowing Dr. Scala–Barnett, the deputy coroner, to testify about blood spatters because she was not qualified as an expert on that subject. In proposition of law VII, Williams argues ineffective assistance because his counsel failed to object to Dr. Scala–Barnett's qualifications as an expert on blood spatters.

{¶ 68} At the outset, we note that Williams failed to challenge the deputy coroner's qualifications at trial and thus waived all but plain error. *State v. Hartman* (2001), 93 Ohio St.3d 274, 286, 754 N.E.2d 1150.

{¶ 69} We find no basis for any complaint of error. Evid.R. 702(B) provides that a witness may qualify as an expert by reason of her specialized knowledge, skill, experience, training, or education. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge she possesses will aid the trier-of-fact in performing its fact-finding function." *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128; *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 191, 616 N.E.2d 909. Blood-spatter analysis is a proper subject for expert testimony. See *State v. Biros* (1997), 78 Ohio St.3d 426, 452, 678 N.E.2d 891; Annotation (1993), 9 A.L.R.5th 369.

{¶ 70} Here, Dr. Scala–Barnett briefly described bloodstains on the victim's pillow as consistent with the "pillow being used to press on her face." Other stains reflected blood dripping onto the pillow. Dr. Scala–Barnett's testimony on these points fell directly within her expertise as a forensic pathologist and her responsibility as a deputy coroner. The coroner's duties include examining the victim and the crime scene and determining the manner and cause of death. "A coroner is an expert witness who is permitted to give an opinion on matters

within his scope of expertise." *State v. Heinish* (1990), 50 Ohio St.3d 231, 234, 553 N.E.2d 1026. Accord *Vargo v. Travelers Ins. Co., Inc.* (1987), 34 Ohio St.3d 27, 30, 516 N.E.2d 226. Dr. Scala–Barnett had performed over 4,600 autopsies, had worked with blood patterns, and had taught classes on that subject. Thus, Dr. Scala–Barnett was well qualified to explain that transfer bloodstains indicated that the killer may have used the pillow to subdue his victim. See *Baston*, 85 Ohio St.3d at 423–424, 709 N.E.2d 128 (Dr. Scala–Barnett's blood-spatter testimony was not prejudicial error). Cf. *Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 44–49 (blood-spatter testimony of homicide detective); *Hartman*, 93 Ohio St.3d at 287, 754 N.E.2d 1150 (the question is not whether the witness, a forensic consultant, is the best expert, but whether the testimony will aid the trier of fact).

{¶ 71} By the same reasoning applied to proposition of law VI, we reject Williams's proposition of law VII, which claims ineffective assistance of counsel. Counsel's decision not to challenge Dr. Scala–Barnett's qualifications to testify about bloodstains reflects "an objective standard of reasonable representation." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Cf. *Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 49–51.

{¶ 72} Moreover, this testimony about bloodstains did not prejudice Williams. Considering the compelling evidence of Williams's guilt, the trial court's exclusion of Dr. Scala–Barnett's testimony on bloodstains could not have created "a reasonable probability that * * * the result of the trial would have been different." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

### Evidence of accused in custody

{¶ 73} In proposition of law VIII, Williams argues that the trial court erred by allowing the jury to receive evidence suggesting that he had been arrested. In related proposition of law IX, Williams argues that his counsel were ineffective by not objecting to evidence that Williams had been arrested and placed in custody for the offenses for which he was then being tried.

{¶ 74} Evidence at trial indicated that following his arrest, Williams was placed in the county jail, and when blood and DNA samples were secured from him in the jail, he volunteered admissions of guilt, i.e., "My dick got me in trouble," and "I won't be screwing any more old ladies." Williams failed to object to this evidence about his arrest and ensuing custody. He thereby waived all but plain error.

{¶ 75} Because the evidence Williams now challenges about his arrest and ensuing custody was brief and inconsequential, no plain error occurred. When a defendant is being tried for aggravated murder, it is self-evident that he had been

arrested. Evidence about a defendant's arrest and ensuing custody does not contravene the presumption of innocence. Further, the jury was not informed that Williams was in custody during the trial, only that he had been in custody when arrested. In any event, the presumption of innocence was fully explained in the voir dire and the jury instructions.

{¶ 76} Precedent, cited by Williams, relating to a defendant's being tried in prison clothing or appearing while shackled has no relevance here. Cf. *Estelle v. Williams* (1976), 425 U.S. 501, 504, 96 S.Ct. 1691, 48 L.Ed.2d 126. The fact that the jury knew that Williams had been arrested for the crimes for which he was being tried is simply not comparable to a jury's seeing a defendant in shackles. Nothing in the record suggests that the trial's result was affected by the disclosure that police had arrested Williams while investigating Velma's murder.

{¶ 77} By the same reasoning applied to proposition of law VIII, we reject proposition of law IX, in which Williams asserts that trial counsel were ineffective for not objecting to evidence that police had arrested him. As noted, that evidence was brief and innocuous, and it did not imply that Williams was in custody during the trial. The evidence was also relevant because it established the context for Williams's voluntary admissions at the nurses' station. Counsel's decision not to object satisfied "an objective standard of reasonable representation." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Finally, compelling evidence established Williams's guilt. Thus, evidence that police had arrested Williams did not cause prejudice. See id. at paragraph three of the syllabus.

### Form of aggravated murder charge

{¶ 78} In proposition of law X, Williams argues that his counsel were ineffective by not objecting to the form of the aggravated felony-murder charge in Count One. In proposition of law XI, Williams argues that the trial court erred by failing, sua sponte, to give a unanimity instruction because the jury might have convicted him on the basis of alternative theories as to the underlying felony in the aggravated murder charge.

{¶ 79} Williams correctly points out that Count One in the indictment alleged that Williams "did purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting *to commit rape, aggravated robbery and/or aggravated burglary.*" (Emphasis added.) "Using 'and/or' [in an indictment] can create ambiguity." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶ 67. Further, the trial court compounded the ambiguity in the indictment by continually referring in the guilt-phase instructions to the predicate felonies in the aggravated murder charge as alternatives. Thus, the court instructed the jury that it must find whether Williams purposely caused the death of another while committing "any of

the following offenses: rape, aggravated robbery, or aggravated burglary." The court's instructions also referred to whether Williams killed Velma during "either rape, aggravated robbery or aggravated burglary."

{¶ 80} Essentially, Williams contends that because Count One lists these alternative felonies as the underlying basis for the felony-murder charge, some jurors might have convicted Williams on the basis of aggravated murder during a rape, while others may have convicted him on the basis of aggravated murder during a robbery or during a burglary. Williams, however, did not object or raise any issue as to this alternative language in the indictment either before or during trial. Also, Williams never objected to the instructions on this basis.

{¶ 81} Neither the form of the aggravated murder charge, which listed the separate underlying felonies of "rape, aggravated robbery and/or aggravated burglary," nor his counsel's failure to object to the indictment or to request a unanimity instruction in the trial phase instructions prejudiced Williams. Under the governing standard of *Strickland v. Washington,* 466 U.S. 668, 677, 104 S.Ct. 2052, 80 L.Ed.2d 674, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 82} Here, no reasonable probability exists that jurors convicted Williams on the basis of alternative theories as to the underlying felony. The jurors separately and independently found, in the three separate death penalty specifications, that the murder occurred (a) during a rape or attempted rape (spec. 1), and (b) during an aggravated robbery or an attempted aggravated robbery (spec. 2), and (c) during an aggravated burglary or attempted aggravated burglary (spec. 3). Moreover, the jurors independently convicted Williams on separate charges of raping Velma (Second Count), of the aggravated burglary of her dwelling (Third Count), and the aggravated robbery of her person (Fourth Count). Thus, all jurors necessarily concluded that Williams had killed Velma while committing or attempting to commit all three felonies.

{¶ 83} By the same reasoning applied to proposition of law X, we reject proposition of law XI, in which Williams claims plain error due to the absence of a unanimity instruction that would specifically require all 12 jurors to unanimously decide which predicate felony Williams had committed. The lack of such an instruction made no difference in the trial. No patchwork verdict occurred. The jury unanimously found that when he killed Velma, Williams had committed or had attempted to commit rape, aggravated burglary, and aggravated robbery by its specific finding of guilty on each of the three specifications. The jury also found that Williams had committed rape, aggravated burglary, and aggravated robbery in Counts Two, Three, and Four.

{¶ 84} Finally, the evidence supported these findings of guilt. Thus, no miscarriage of justice arose. *Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. We have previously found no plain error in indictments referring to "aggravated robbery and/or aggravated burglary." *Noling,* 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶ 67. Accord *State v. Keene* (1998), 81 Ohio St.3d 646, 664, 693 N.E.2d 246. No violation of due process occurred here. *Schad v. Arizona* (1991), 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (plurality opinion) (instructions that did not require the jury to agree on one of the alternative theories of premeditated and felony-murder did not deny due process).

## Penalty–phase issues

{¶ 85} *Ineffective assistance of counsel.* In proposition of law XII, Williams claims that he received "constitutionally ineffective counsel at the mitigation phase" because his counsel called Dr. Christopher Layne, a psychologist, as a defense expert witness. Williams argues that Dr. Layne provided no useful defense evidence and affirmatively damaged the case for a life sentence. For example, Dr. Layne described Williams as a "psychopathic deviant," a "hardened, gutless criminal" with an antisocial personality who "could [not] care less who[m] he hurt[s] or what he does [and] doesn't think anything is his fault."

{¶ 86} According to *Strickland v. Washington,* both deficient performance and prejudice are required to justify reversal based on ineffective assistance of counsel. Id., 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. We find that Williams has not established either one. The decision to call Dr. Layne represented a reasonable professional judgment based on the theory that if jurors knew Williams's background and history, and how and why he developed into the person that he was, they would be less likely to recommend death. We find nothing in the record that suggests that Williams had any other available mitigating evidence, such as evidence of statutory mitigating factors in R.C. 2929.04(B)(1) through (B)(6).

{¶ 87} Dr. Layne examined extensive records relating to Williams and interviewed him twice. Dr. Layne described Williams's dysfunctional family, his irresponsible parents, the abuse heaped upon him as a child, his chaotic upbringing, and his mental and emotional problems, such as paranoia and "psychotic like" symptoms. Dr. Layne thus described Williams's history and background. Counsel might reasonably have believed that testimony from a clinical psychologist would be more persuasive to the jury than testimony from interested family members or other sources.

{¶ 88} Further, Dr. Layne testified that if Williams had received proper discipline, counseling, and psychiatric treatment as he was growing up, "the probability [would be] low that we would be sitting here." Dr. Layne also

described Williams's problems with alcohol and chronic depression, and noted that Williams would be less dangerous as he grew older in prison. In its entirety, Dr. Layne's testimony represented potentially credible mitigation evidence that counsel could reasonably present to the jury. Dr. Layne's testimony explained, in depth, Williams's history and background, and helped place Dr. Layne's negative comments about Williams's character into a broader context.

{¶ 89} Moreover, Williams has not established prejudice, i.e., that if Dr. Layne had not testified, a reasonable probability exists that the result of the trial would have been different. *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Dr. Layne was the centerpiece of the defense mitigation case in the effort to counterbalance the three aggravating circumstances. In contrast, the testimony of a few relatives of Williams offered sparse mitigation. Further, we have no basis to believe that additional testimony from Williams's relatives would have provided more persuasive mitigation. For these reasons, we reject proposition of law XII.

{¶ 90} In proposition of law XVII, Williams argues that his counsel provided constitutionally ineffective counsel by not making appropriate objections and thereby failed to "adequately preserve the record for appellate purposes."

{¶ 91} We reject proposition of law XVII for the following reasons. First, Williams fails to cite any examples of, or record references to, counsel's deficiency. As we noted in *State v. Bey* (1999), 85 Ohio St.3d 487, 504, 709 N.E.2d 484, "[b]y failing to cite examples of asserted ineffectiveness, [the defendant] has failed to demonstrate either his counsel's deficient performance or prejudice arising from the deficient performance. Both are required to prove ineffective assistance of counsel." See, also, *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373. Second, we find no examples of prejudicially deficient performance from our review of the record. Counsel for Williams fought vigorously in the trial and in the mitigation phase against overwhelming evidence. Thus, we reject proposition of law XVII.

{¶ 92} *Jury instructions.* In proposition of law XIII, Williams argues that the trial court erred by issuing penalty-phase instructions that excluded the word "mercy," and stated that if the aggravating circumstances were in equipoise with mitigating factors, the jury was required to "consider" rather than impose a life sentence.

{¶ 93} The trial court did not abuse its discretion in deleting the reference to mercy in the penalty-phase instructions over defense objection. Admittedly, a trial court may refer to mitigating factors "which 'in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability.'" See *State v. Garner* (1995), 74 Ohio St.3d 49, 57, 656 N.E.2d 623. The trial court, however, need not refer to mercy in that context, and the trial court did not

abuse its discretion because "mercy is not a mitigating factor." *State v. O'Neal* (2000), 87 Ohio St.3d 402, 416, 721 N.E.2d 73, citing *Lorraine,* 66 Ohio St.3d at 417, 613 N.E.2d 212.

{¶ 94} Williams also asserts that the trial court "erred in informing the jury that if they found the aggravating circumstances to be in equipoise, they were required to 'consider' a life sentence." In fact, the court instructed the jury that "[i]f the aggravating circumstances and mitigating factors are equal, then we [the jury] must proceed to consider the life sentence option."

{¶ 95} However, Williams failed to object to the "equipoise" instruction, and waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. See, also, Crim.R. 30(A); *Williams,* 51 Ohio St.2d at 117, 5 O.O.3d 98, 364 N.E.2d 1364. The language, while possibly awkward, did not create plain error or prejudice. The context of the instruction shows that the court was referring to the choice among life options. Thus, the court instructed: "If the jury cannot unanimously agree on the sentence of death, it will then deliberate to consider *which life sentence is appropriate.*" (Emphasis added.) The court then reemphasized, "[i]n other words, you should proceed to *consider and choose one of the life sentence options* if any one or more of you conclude the State has failed to prove that the aggravating circumstances outweigh the mitigating factors." (Emphasis added.) Accordingly, we reject proposition of law XIII as lacking merit. See, e.g., *State v. Hill* (1995), 73 Ohio St.3d 433, 437–438, 653 N.E.2d 271; *State v. Madrigal* (2000), 87 Ohio St.3d 378, 395–396, 721 N.E.2d 52.

{¶ 96} ***Ex parte discussion between judge and jury.*** In proposition of law XIV, Williams argues that the trial court erred when the judge held an off-the-record ex parte discussion with jurors after the penalty verdict. After the jury's penalty verdict was announced, the trial judge thanked the jurors and noted, "I need to have you return to the jury room for a few minutes. * * * I want to come back and talk to you for a few minutes."

{¶ 97} We reject Williams's claim of error for several reasons. First, when the judge noted that he would speak with jurors, counsel were present and did not object. The record does not state whether counsel were present in the jury room, but counsel certainly had an opportunity to be present. In *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, we recognized that parties cannot complain about ex parte contacts that they knew about in advance. "To prevail on a claim of prejudice due to an *ex parte* communication between judge and jury, the complaining party must first produce some evidence that a private contact, *without full knowledge of the parties,* occurred between the judge and jurors which involved substantive matters." (Emphasis added.) Id. at paragraph thirteen of the syllabus. See, also, *Hessler,* 90 Ohio St.3d at 122,

734 N.E.2d 1237 (no prejudicial error because the "parties knew about the communications between the court and the juror before they occurred").

{¶ 98} Second, Williams has not established that he was prejudiced by any conversations that the trial judge may have had with the jury. In fact, he has not even attempted to reconstruct what occurred in an effort to show prejudice. See App.R. 9(B) and (E); *State v. Goodwin* (1999), 84 Ohio St.3d 331, 340, 703 N.E.2d 1251. We have declined to reverse on the basis of unrecorded conferences when the accused has failed to demonstrate material prejudice. *State v. Nields* (2001), 93 Ohio St.3d 6, 27, 752 N.E.2d 859. See, also, *State v. Johnson* (2000), 88 Ohio St.3d 95, 106–107, 723 N.E.2d 1054 (judge giving juror a ride to her car was "harmless" error where neither spoke about the trial); *Hill*, 73 Ohio St.3d at 444, 653 N.E.2d 271 ("a trial court's *ex parte* communication with the jury is not necessarily prejudicial error"); *State v. Allen* (1995), 73 Ohio St.3d 626, 630, 653 N.E.2d 675 ("if the communication [between the judge and jury] is not 'substantive,' the error is harmless").

{¶ 99} Third, when the judge and jury met, the jurors had satisfied their official task and were free to discuss the case. As was the case in *Hessler*, 90 Ohio St.3d at 122, 734 N.E.2d 1237, "the jury had already reached a decision and the juror [with whom the judge had privately spoken] had already signed the sentencing forms." While here, the court still had to sentence Williams, trial courts in a criminal case are presumed to consider " 'only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, quoting *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65. Accord *State v. Treesh* (2001), 90 Ohio St.3d 460, 488, 739 N.E.2d 749 (trial court can be presumed not to give weight to sentence recommendation of victim's family); *State v. Dennis* (1997), 79 Ohio St.3d 421, 433, 683 N.E.2d 1096 (trial judge can be presumed to disregard victim-impact evidence on decision as to death penalty). Accordingly, we reject proposition of law XIV.

### Cumulative error

{¶ 100} In proposition of law XVIII, Williams makes a generalized claim that the cumulative effect of errors in his trial necessitates reversal of his conviction and death sentence. Upon review, we determine that Williams received a fair trial and a fair sentencing determination, and no prejudicial error occurred. Moreover, "[s]uch [nonprejudicial] errors cannot become prejudicial by sheer weight of numbers." *Hill*, 75 Ohio St.3d at 212, 661 N.E.2d 1068; *State v. Hooks* (2001), 92 Ohio St.3d 83, 85, 748 N.E.2d 528.

## Settled issues

{¶ 101} *Reasonable doubt.* We summarily reject Williams's challenges, in proposition of law XV, to the court's reasonable-doubt instruction and its use of the definition from R.C. 2901.05(D). *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604; *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph two of the syllabus.

{¶ 102} *Residual doubt.* In proposition of law XVI, Williams argues that *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, which held that residual doubt is not an acceptable mitigating factor, improperly restricts this court's independent evaluation of the appropriateness of the death penalty. Nonetheless, we reject proposition of law XVI and continue to adhere to *McGuire* as controlling precedent. See, e.g., *Treesh,* 90 Ohio St.3d at 492, 739 N.E.2d 749. Moreover, we find no residual doubt under the facts of this case.

{¶ 103} *Proportionality.* On the basis of settled precedent, we reject Williams's proposition of law XIX, by which he urges us to revisit the scope of this court's proportionality review. See *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Smith* (1997), 80 Ohio St.3d 89, 118, 684 N.E.2d 668; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

{¶ 104} *Constitutionality.* We also summarily reject proposition of law XX challenging the constitutionality of Ohio's death penalty statutes. *State v. Carter* (2000), 89 Ohio St.3d 593, 606–608, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. Additionally, Williams failed to raise his international-law challenge at the trial court and thereby waived those claims. *State v. Coley* (2001), 93 Ohio St.3d 253, 271, 754 N.E.2d 1129; *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus.

## Independent sentence evaluation

{¶ 105} *Penalty-phase evidence.* In the mitigation phase of the trial, Williams presented the testimony of his mother and two sisters. Joyce Williams, the defendant's mother, testified as follows. Williams was the oldest of four children. Their father did not care for the children, and he did not support the family either while he was living with them or after he and she divorced. While growing up, Williams had no suitable male role models. Joyce worked to support the children and believed that she was a good mother although she "whooped" the children to discipline them. While growing up, Williams was regularly in juvenile court.

{¶ 106} Tracy Anderson, Williams's sister, described their mother as very hard, cold, and never affectionate to Williams. Their mother physically abused the children, e.g., she beat them and banged their heads on the wall; she abused them verbally by calling them "whores [and] tramps"; and she treated Williams the worst. Williams, as Tracy's older brother, protected and took care of Anderson, and she loved him.

{¶ 107} Robin Williams, a registered nurse and another sister of Williams, described their mother as "stern, aggressive, [and a] difficult person to talk to." She beat the children with an extension cord. The children did not communicate with their father's family because they were "alcoholics and drug abusers." Her brother protected her while they were growing up. Her brother loves her children and sometimes baby-sat for her. She loves her brother and wants his life to be spared.

{¶ 108} Dr. Christopher Layne, a clinical psychologist, evaluated Williams and described his history and background. When Williams was 13 years old, a clinical report noted a "chaotic, unstable, inconsistently supervised childhood." He had a weak ego, was "prone to distort reality," and was "moody," "impulsive," and "mildly paranoid." His IQ was 96. Psychiatric hospitalization was recommended. At age 15, he was drinking, smoking pot, and became "even more hostile" with bizarre elements in thought and behavior. By age 16, he was a "full-blown psychopathic deviant." As a child he had high fevers, a head injury at age 11, and he suffered a skull fracture when he was 18 years old.

{¶ 109} During his life, Williams had a variety of legal problems relating to offenses such as "attempted rapes, molesting, sexual imposition, sexual assaults, probation violations [and] purse snatching." Williams now "could [not] care less who[m] he hurt[s] or what he does." Although not brain damaged, he "is a hardened gutless criminal," with an "antisocial personality disorder." But he will "mellow out" in prison after he is 40 years old.

{¶ 110} During cross-examination, Dr. Layne disclosed that Williams had committed various sex offenses when he was 12 to 16 years old. He assaulted boys and girls in his neighborhood as well as one of his sisters. He had spent more than a decade in institutions for criminals, and does not take responsibility for anything he does.

{¶ 111} In an unsworn statement to the jury, Williams asserted, "I give my life to God, and I leave the rest up to you. I'm sorry about that night. * * * And only God knows what happened because I * * * really don't know either."

{¶ 112} *Sentence evaluation.* After independent assessment, we determine that the evidence proved, beyond a reasonable doubt, the three separate aggravating circumstances, i.e., Williams murdered Velma McDowell during a rape, an

aggravated robbery, and an aggravated burglary, all in violation of R.C. 2929.04(A)(7).

{¶ 113} We find no mitigating features in the nature and circumstances of the aggravated murder. Williams brutally raped and robbed an elderly woman in the sanctity of her home, stuffed a rag down her throat to stifle screams, and then strangled her to death.

{¶ 114} Conversely, Williams's history and background provide some modest mitigating features. While growing up, Williams lacked nurturing parents; his father abandoned the family, and his mother was cruel towards the children. While growing up, Williams turned to the streets for role models to guide his behavior. As a result, he suffered a variety of emotional and psychological problems, and he never received the discipline, treatment, and counseling he needed. While he is competent and mentally responsible for his actions, he has an "antisocial personality disorder," a warped value system, and he does not accept responsibility for his actions. In contrast to his history and background, Williams's character offers no mitigating features.

{¶ 115} As to statutory mitigating factors, Williams does not claim, and we find no evidence, that any of the statutory mitigating factors specified in R.C. 2929.04(B)(1) through (B)(6) are relevant.

{¶ 116} Under R.C. 2929.04(B)(7)'s "other factors," we consider, as mitigating factors, Williams's psychological problems and the remorse he expressed in his unsworn statement. We also consider the fact that he ultimately confessed to police that he killed Velma after initially denying any involvement.

{¶ 117} Nonetheless, we have concluded that the combined aggravating circumstances of murder during a rape, aggravated burglary, and aggravated robbery outweigh the collective mitigating evidence beyond a reasonable doubt. The victim of the rape, robbery, and burglary was 88 years old, and Williams brutally and mercilessly murdered her at night in her own home. In contrast, aside from the serious difficulties that he had growing up and his current psychological problems, Williams offered no significant mitigation evidence to weigh against these collective aggravating circumstances. Accordingly, we find the death penalty here is entirely appropriate.

{¶ 118} We also find the death penalty is proportionate when we compare Williams's case with other aggravated murders committed during the course of an aggravated burglary and an aggravated robbery. See, e.g., *Thomas,* 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017; *Jones,* 90 Ohio St.3d 403, 739 N.E.2d 300; *State v. Stallings* (2000), 89 Ohio St.3d 280, 731 N.E.2d 159; *Berry,* 72 Ohio St.3d 354, 650 N.E.2d 433; *State v. Slagle* (1992), 65 Ohio St.3d 597, 605 N.E.2d 916; *State v. Murphy* (1992), 65 Ohio St.3d 554, 605 N.E.2d 884; *Lott,* 51 Ohio

St.3d 160, 555 N.E.2d 293; and State v. Barnes (1986), 25 Ohio St.3d 203, 25 OBR 266, 495 N.E.2d 922.

{¶ 119} We also find that the death penalty for Williams is proportionate when compared with cases involving a rape specification. See, e.g., Carter, 89 Ohio St.3d 593, 734 N.E.2d 345; State v. Mason (1998), 82 Ohio St.3d 144, 694 N.E.2d 932; McGuire, 80 Ohio St.3d 390, 686 N.E.2d 1112; and Biros, 78 Ohio St.3d 426, 678 N.E.2d 891.

{¶ 120} Accordingly, we affirm the defendant's convictions and sentence of death.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, HOFFMAN and LUNDBERG STRATTON, JJ., concur.

WILLIAM B. HOFFMAN, J., of the Fifth Appellate District, sitting for COOK, J.

---

Julia R. Bates, Lucas County Prosecuting Attorney, Brenda J. Majdalani and Timothy F. Braun, Assistant Prosecuting Attorneys, for appellee.

Jeffrey M. Gamso and Spiros P. Cocoves, for appellant.