DECISION AND JUDGMENT ENTRY
{¶ 1} After an Adams County jury found Mark A. Harp guilty of one count of felonious assault, the trial court sentenced him to five years in prison. According to the testimony of John Bays, the victim, Harp started the fight by attacking Bays with a broken pocketknife. However, Harp testified that he fought Bays in self-defense after Bays threatened to shoot him and kicked him in the groin.
 {¶ 2} In his appeal, Harp argues that the trial court erred in excluding evidence of Bays's reputation for violence. Harp wanted to testify that he feared Bays because of the victim's reputation for shooting people; based on that fear of serious bodily harm, he acted in self-defense in fighting Bays. However, because Harp's attorney agreed that the testimony concerning Bays's reputation should be stricken, Harp invited the error. Furthermore, even if we were to decide that Harp did not invite the error, we cannot *Page 2 
conclude that the trial court abused its discretion in excluding this testimony because there is nothing in the record showing that Harp was aware before the fight of Bays's reputation for violence.
 {¶ 3} Second, Harp argues that the trial court committed plain error by not addressing the prosecutor's expressions of personal opinion regarding the facts of the case and the credibility of the witnesses. The prosecutor's comments included phrases like, "I don't think there's any serious question . . . ," and "I will tell you why." However, the prosecutor's statements simply reflected fair commentary on the evidence and did not place his own credibility at issue or imply knowledge of facts outside the record. We do not believe that the State's closing argument, viewed as a whole, deprived Harp of a fair trial.
 {¶ 4} Accordingly, we affirm the judgment.
 I. Facts {¶ 5} In May 2006, Bays went over to David Tucker's house in Manchester, Ohio, to pick up a swimming pool that Tucker had agreed to lend him in exchange for using Bays's trailer. As Bays and Tucker loaded the pool onto the trailer, Harp came onto Tucker's property and asked Bays if he knew Ben Raines. Harp told Bays that Raines was a friend and to leave him alone. According to Bays's testimony at trial, he and Raines had exchanged words at a local fast-food restaurant, but Bays asserted that he did not know why there was any problem with Raines. Bays testified that he "could tell by [Harp's] nature that he was wanting to fight * * * with me" because Harp was "really mad." Bays explained that he told Harp that he didn't want any trouble, at which point Harp tore off his shirt. Then, according to Bays, Harp struck him with a *Page 3 
pocketknife with a broken blade, causing a laceration on Bays's face and knocking him over into the trailer. Bays stated that he never struck Harp or followed Harp off of Tucker's property, although he admitted attempting to kick Harp as Harp hit him a third time. Harp then ran from the scene.
 {¶ 6} Tucker testified in the State's case-in-chief. Tucker explained that when he came outside, he heard Bays and Harp arguing with each other. According to Tucker, Harp left his property and went on to Harps' uncle's property, which adjoined Tucker's property. Bays followed Harp over the property line, where the fist fight began. Tucker did not know who threw the first punch, but he explained that the fight continued, with neither doing any damage to the other, until Bays backed onto Tucker's property and fell backward over a trailer. Harp then hit Bays several more times, the fight was over, and Harp ran from the property.
 {¶ 7} In his defense, Harp presented the testimony of Shade Littleton and Carla Ricketts. Littleton testified that he was outside feeding his dogs when he heard Bays yelling at Harp and threatening him. According to Littleton, Harp turned to walk away, and Bays followed him. Bays then kicked Littleton in the groin, and Harp punched Bays in the face, knocking him onto a small trailer. Littleton testified that Bays continued to fight until Harp hit him twice more and Harp walked away. Ricketts, Harp's aunt, testified that Bays came to her house some time after the fight looking for Harp and threatening "to shoot his brains out."
 {¶ 8} Harp testified on his own behalf. However, before he took the stand, Harp's lawyer asked the trial court about a motion in limine regarding incidents that occurred after the fight involving Bays and his firearms. The court explained that it had *Page 4 
excluded evidence of subsequent incidents involving Bays other than the threat made to Ricketts. Harp testified that he approached Bays "to ask the guy what his problem was with my friends. * * * [H]e had been making sexual allegations to the guy's [sic] wives * * *." Harp explained that Bays had been making "perverted" "come-ons" to these women at their work. Harp told Bays that he should leave his friends alone, at which point Bays became violent, threatened Harp, and "started making allegations about shooting me. He has a reputation for shooting people."
 {¶ 9} The State objected to testimony regarding Bays's reputation for shooting people, and Harp's lawyer represented to the court that he had instructed Harp not to discuss Bays's reputation for violence. Both the State and Harp's attorney agreed that the court should strike that statement and give a corrective instruction, which the court did.
 {¶ 10} Harp testified that, after Bays threatened to shoot him, he walked away, but Bay pursued him. According to Harp, Bays attacked him, and Harp was afraid of Bays. Harp attempted to explain that he was in fear of his life because of Bays's reputation, but his lawyer stopped and redirected him. Harp testified that, after Bays kicked him, Harp "defended [him]self well." However, Harp denied having anything in his hands when he struck Bays. According to Harp, Bays kept fighting after Harp knocked him down. Harp then struck Bays two more times, ended the fight, and walked away. He then returned home to Kentucky. On cross-examination, the State asked Harp if he ever saw Bays brandish a firearm. Harp admitted that he did not see Bays with a firearm, but he explained that "[Bays is] licensed to carry a firearm and he packs it in his vehicle, and I know that, everybody knows that." *Page 5 
 {¶ 11} There was no testimony that Bays had a firearm on his person at the time of the fight.
 {¶ 12} The jury found Harp guilty of felonious assault, and the trial court sentenced him to five years in prison. Harp filed this appeal.
 II. Assignments of Error {¶ 13} Harp presents two assignments of error:
 1. "The trial court erred when it excluded evidence of specific acts of violence by the victim that was admissible to prove Defendant's state of mind in support of Defendant's claim of self defense and to demonstrate that Defendant had a valid reason for fearing the victim. Evid. R. 404(A)(2) and 405(B); Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Section 10, Article I of the Ohio Constitution. (Vol. II, Tr. 167-168)."
 2. "Instances of prosecutorial misconduct, which occurred throughout closing argument, deprived Mr. Harp of his right to a fair trial. Fifth and Fourteenth Amendments, United States Constitution; Section 16, Article I, Ohio Constitution. (Vol. II, Tr. 214, 215, 216, 217, 218, 219, 221, 222, 223)."
 III. Bays's Reputation for Violence {¶ 14} In his first assignment of error, Harp argues that the trial court erred in excluding "character evidence regarding the victim's history of violent acts against others with whom the victim had disputes." In particular, Harp relies on the following exchange at the bench between his trial counsel and the trial court:
 MR. McILWAIN: * * * [W]e had some discussions off the record about incidences occurring with Mr. Bays after the fact, and I * * * didn't know if there was an in limine to bar testimony regarding that.
 COURT: [W]e've allowed testimony as to the alleged actions of the alleged victim . . .
 MR. McILWAIN: Right. *Page 6 
 COURT: . . . shortly after this alleged event, and that being with Ms. Ricketts, but other than that I have foreclosed furtherance of subsequent acts between these parties.
 * * *
 MR. McILWAIN: So in plain English is that * * * incidents involving Mr. Bays and firearms are off limits for Mr. Harp to talk about, is what you're saying? His knowledge of [. . .]
 COURT: Well are you suggesting on the day of the event, May 29th?
 MR. McILWAIN: No, no, because it happened after the fact.
 * * *
 COURT: * * * [A]re we clear that any subsequent altercations or verbal altercations or physical altercations between the alleged victim and the defendant, that they are, they are not subject to relevancy in this particular case?
 MR. McILWAIN: Well I'm not suggesting that there were, I know there's been some other incidents where Mr. Bays was investigated.
Harp argues that this exchange "demonstrates [trial counsel's] understanding that evidence of post incident conduct by Victim Bays is not relevant or admissible, but signals that he is aware of other conduct of Mr. Bays which predate the incident and may be admissible to prove self defense." According to Harp, the trial court's ruling prevented him from establishing that he had a bona fide fear of harm by Bays, an element of self-defense.
 {¶ 15} The admission or exclusion of evidence is committed to the sound discretion of the trial court. State v. Haines,112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, at ¶ 50; State v. Robb (2000),88 Ohio St.3d 59, 68, 723 N.E.2d 1019. Absent an abuse of discretion, an appellate court will not disturb a trial court's ruling regarding the admissibility of evidence. State v. Martin (1985), 19 Ohio St.3d 122,129, *Page 7 483 N.E.2d 1157. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151,157, 16 O.O.3d 169, 404 N.E.2d 144.
 {¶ 16} The only indication in the record that there had been other incidents of violence involving Bays is Harp's stricken testimony that Bays had a "reputation for shooting people." The State objected to this testimony, and Harp's trial counsel moved that it be stricken and that the court give a curative instruction. Thus, not only did trial counsel fail to argue that this evidence was admissible, he invited any error by moving that the testimony be stricken and that a curative instruction be given. "Under the invited-error doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." State ex rel. Bitter v. Missig (1995),72 Ohio St.3d 249, 254, 648 N.E.2d 1355, citing State ex rel. Fowler v.Smith (1994), 68 Ohio St.3d 357, 359, 626 N.E.2d 950. Thus, Harp cannot now complain that the trial court erred in excluding testimony regarding Bay's reputation for shooting people.
 {¶ 17} Moreover, even if Harp had not invited the error, the trial court did not abuse its discretion by excluding this testimony. Contrary to Harp's assertion, the record does not demonstrate that "[trial counsel was] aware of other conduct of Mr. Bays which predate[d] the incident and may be admissible to prove self defense." Instead, the record shows, at most, that at the time of trial Harp believed that Bays had a reputation for shooting people. Trial counsel referred only to incidents that occurred after the fight with Bays. Neither trial counsel nor Harp in his testimony specifically *Page 8 
stated that there were incidents that occurred before the fight of which Harp was aware that gave Harp a reason to fear Bays. Thus, it is not clear from the record that Harp was aware of Bays's reputation for violence before the fight. In effect, Harp now wishes us to speculate that Harp would have testified that Bays had such a reputation before the fight, but absent a proffer of evidence, we cannot conclude this to be the case.
 {¶ 18} Furthermore, as the record now stands, any error would be harmless. Here, Harp testified that he knew Bays carried a firearm and that, immediately before the fight, Bays threatened to shoot him. Notwithstanding this evidence, which Harp contends gave him a reason to believe that his life was in danger, the jury still convicted him. Apparently, the jury simply did not believe Harp when he testified that he acted in self-defense. It does not seem logical that the jury would have credited Harp's testimony that Bays had a reputation for violence if it chose not to believe his testimony that Bays threatened to shoot him and that he knew Bays had the ability to carry that threat out. We therefore overrule Harp's first assignment of error.
 IV. Prosecutorial Misconduct {¶ 19} In his second assignment of error, Harp argues that the State deprived him of a fair trial by engaging in prosecutorial misconduct throughout its closing argument. In particular, he argues that the prosecutor improperly vouched for the credibility of the State's witnesses and improperly expressed his personal opinion regarding the facts of the case.
 {¶ 20} "A prosecutor's remarks constitute misconduct if the remarks were improper and if the remarks prejudicially affected an accused's substantial rights." State v. Williams, 99 Ohio St.3d 439,2003-Ohio-4164, 793 N.E.2d 446, at ¶ 44, citing State v. *Page 9 Smith (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. State v. Lott (1990),51 Ohio St.3d 160, 166, 555 N.E.2d 293. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" State v.Gapen, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, quotingSmith v. Phillips (1982), 455 U.S. 209, 219, 102 S. Ct. 940,71 L.Ed.2d 78. We must "view the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial."State v. Treesh (2001), 90 Ohio St.3d 460, 466, 739 N.E.2d 749.
 {¶ 21} Because Harp failed to object at trial to the allegedly improper comments by the prosecution, he has waived all but plain error. Crim. R. 52(B); State v. Slagle (1992), 65 Ohio St.3d 597, 604,605 N.E.2d 916. "We may invoke the plain error rule only if we find (1) that the prosecutor's comments denied appellant a fair trial, (2) that the circumstances in the instant case are exceptional, and (3) that reversal of the judgment below is necessary to prevent a miscarriage of justice."State v. McGee, Washington App. No. 05CA60, 2007-Ohio-426, at ¶ 15, citing State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.
 {¶ 22} Harp argues that the prosecutor improperly gave his opinion regarding Harp's claim of self-defense when he argued that "obviously our position is that there was not a right to self-defense, given these circumstances, and I will tell you why." Similarly, he challenges the prosecutor's argument that "we maintain that the facts are [sic], as we understand them, reflect just a straight plain and simple felonious assault, with no right of self defense." We fail to see how these statements are improper. Here, *Page 10 
the State simply argued that it had established each of the elements of felonious assault and that the evidence did not support Harp's claim that he fought Bays in self-defense. We believe that this statement represents a fair comment on the evidence.
 {¶ 23} Harp contends that the prosecutor "invade[d] the providence of the jury" by stating that "I don't think there's any serious question that Mr. Harp caused serious physical harm to Mr. Bays." However, Harp never contested that Bays had suffered serious physical injury. Harp stipulated to the admission of Bays's medical records, which showed that Bays had been treated for facial and nasal fractures. Furthermore, Harp did not object to the admission of photos of Bays's injuries taken soon after the fight. Furthermore, Bays testified regarding the extent of his injuries, explaining that he had many broken bones in his face, had a titanium plate placed in his face, cannot breath out of the left side of his mouth or out of his nose, and that he had lost his sense of taste and smell. Similarly, Harp argues that the prosecutor engaged in misconduct by arguing that "knowingly means he did it on purpose, when you make a fist and strike someone, I don't know how else you can say that that's not on purpose." However, Harp did not argue that he did not knowingly hit Bays, and Harp testified that, after attacked, he "defended [him]self well." Therefore, we do not believe it was improper for the prosecutor to preface his statements with "I don't think" and "I don't know," because "the prosecutor simply argued what the evidence established either directly or by fair inference." Williams at ¶ 46.
 {¶ 24} Harp also argues that the prosecutor improperly gave a personal opinion on the evidence when he argued that "I think there's some evidence that he took his shirt off, which as far as I'm concerned is the international sign that you're about to fight *Page 11 
someone." Although improper, this statement of personal opinion was not egregious enough to have conceivably affected the outcome of the trial. On the stand, Bays explained that he "could tell by [Harp's] nature that he was wanting to fight * * * with me[,]" and he testified that Harp took his shirt off immediately before starting the fight. Bays also testified that he did not take his shirt off or "do anything else like [he was] squaring up to fight * * *[.]" Given the evidence presented at trial that Harp started the fight, we cannot say that this statement deprived Harp of a fair trial.
 {¶ 25} Next, Harp argues that the State unfairly vouched for its witnesses' credibility and unfairly discredited defense witnesses. "A prosecutor's statement on witness credibility is not an improper voucher where it neither implies knowledge of facts outside the record nor places the prosecutor's personal credibility at issue." State v.Miller, Washington App. No. 06CA11, 2007-Ohio-427, at ¶ 24, citingState v. Keene (1998), 81 Ohio St.3d 646, 666, 693 N.E.2d 246; see, also, State v. Davis, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 247 ("An attorney may not express a personal belief or opinion as to the credibility of a witness.").
 {¶ 26} In closing, the prosecutor argued that "I would submit to you this, the fact that there were some small inconsistencies in [Bays's and Tucker's] testimony goes to show, in my view, or in the view, we would submit how credible the testimony was, how unrehearsed it was." Although the prosecutor may have improperly phrased his argument in the form of a personal opinion, reading the record as a whole demonstrates that, rather than placing his own personal credibility at issue, the prosecutor attempted to argue facts supporting the particular credibility decisions that the jury needed to make in order to find Harp guilty. See State v. Green, 90 Ohio St.3d 352, 374, 2000-Ohio-182, *Page 12 738 N.E.2d 1208 (finding that the prosecution did not vouch for a witness in closing arguments but instead "argued facts to support [the witness's] credibility * * *."). Before the prosecutor made these statements, he explained that the jury would have the job of determining which witnesses to credit and which to discredit. In particular, he noted that the testimony at trial demonstrated different versions of what happened, and he explained that "you'll have to sort that out, and you have to use your common sense, what you observed from the demeanor on the stand, and some of the different ways that this testimony differs in deciding basically who was more credible and who is not." The prosecutor then used the evidence presented at trial to explain why the testimony of two State witnesses could be inconsistent with each other in some regards but nonetheless both be credible. Although the prosecutor improperly personalized this statement, we believe that the State could legitimately use the evidence presented at trial to explain the inconsistencies in its witnesses' testimony. Thus, we do not believe that this statement deprived Harp of a fair trial.
 {¶ 27} The prosecutor attacked Shade Littleton's credibility by explaining that "[h]e also testified, and I would submit to you incredibly, that even though he goes to * * * [Harp's uncle] Clint Richmond's house, as he said almost every day, that he never really talked to Mark Harp about his testimony." He also attacked Littleton's credibility by arguing that "[y]ou had a chance to observe his demeanor and credibility when I questioned him, and we would ask you to give that the weight that it's due. Again, not much, we would submit to you." We do not believe that either of these statements represents an improper personal opinion on Littleton's lack of credibility. Here, again, the State argued the facts that suggested that Littleton was not a credible witness, in *Page 13 
particular noting that Littleton waited a year to come forward with his eyewitness account of the fight and that Littleton could not recall what clothes Bays wore even though he remembered other details of the fight. The prosecutor also reminded the jury it was to make these credibility determinations, that the jury should gauge Littleton's credibility and demeanor, and that the members of the jury should decide for themselves whether State had correctly described Littleton's testimony. SeeState v. Ballew, 76 Ohio St.3d 244, 255, 1996-Ohio-81, 667 N.E.2d 369
("Here, the prosecutor did not err by arguing that Coffey was a principal to these offenses, that his testimony was incredible and contrary to other witnesses, and that the jury should not lose sight of the evidence.").
 {¶ 28} Finally, we have reviewed the State's closing arguments in its entirety, and we do not believe that the prosecutor's comments, taken together, deprived Harp of a fair trial. A prosecutor may comment in closing argument on what the evidence has shown and what reasonable inferences the prosecutor believes may be drawn from it. State v.Lott (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293. Here, the prosecutor's argument, even if sometimes improperly phrased in personalized terms, focused on the evidence presented at trial and the reasonable inferences that the jury would be permitted to draw. Therefore, the trial court did not commit plain error in failing to address the prosecutor's statements. Accordingly, we affirm the judgment below.[1]
 JUDGMENT AFFIRMED. *Page 14 
 JUDGMENT ENTRY
It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Adams County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, J. McFarland, J.: Concur in Judgment and Opinion.
[1] Because Harp has not challenged the trial court's order requiring him to pay restitution in the amount of $17,833.77 to the Victims of Crime Fund, we do not address whether doing so represented error. But, see, State v. Smith, Washington App. No. 07CA25, 2008-Ohio-142, at ¶ 5 (holding that R.C. 2929.18(A)(1) does not permit the trial court to award restitution to third-parties such as the Ohio Victims of Crime Fund). *Page 1