OPINION *Page 2 
{¶ 1} Defendant-appellant, Rick Southall, appeals his conviction and sentence from the Stark County Court of Common Pleas on one count of rape. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On September 5, 2007, the Stark County Grand Jury indicted appellant on one count of rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree, and one count of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A)(B)(3), a felony of the third degree. The charge of rape arose from allegations that appellant, from June of 1991 to June of 1992, had engaged in sexual conduct, including fellatio, with a twelve year old male child. At his arraignment on September 13, 2007, appellant entered a plea of not guilty to the charges.
 {¶ 3} On October 1, 2007, appellant filed a motion to sever the two counts of the indictment, noting that the charge of unlawful sexual conduct with a minor arose from allegations concerning the period from September 2005 to February of 2007. The trial court granted such motion. On April 4, 2008, a jury found appellant not guilty of the offense of unlawful sexual conduct with a minor.
 {¶ 4} Thereafter, a jury trial on the charge of rape commenced on April 29, 2008. The following testimony was adduced at trial.
 {¶ 5} Cindy Southall is the mother of Jack Gardner, who was born on June 16, 1979. Cindy Southall married appellant on March 11, 1991, after she met him while her son was playing baseball. Shortly after the marriage, when Jack was approximately twelve years old, the three of them moved into a house on Roslyn Avenue in the City of *Page 3 
Canton. At the time, Cindy Southall was working at the YWCA from 8:00 a.m. to 5:00 p.m. and appellant was working the midnight shift at a local hospital. Cindy Southall testified that appellant watched Jack while she was at work and would take Jack to his basketball and swim team practices. According to Southall, Jack and appellant spent time together engaged in sports.
 {¶ 6} Southall testified that her son's relationship with appellant changed in, she believed, the summer of 1993. She testified that she received a telephone call from appellant while at work and that during the call, appellant was on one telephone line at home and Jack was on another. According to Southall, Jack was "crying and screaming" and appellant sounded angry. Trial Transcript at 234-235. The following is an excerpt from Southall's trial testimony:
 {¶ 7} "Q. Did you inquire what was going on?
 {¶ 8} "A. Yes, I did.
 {¶ 9} "Q. And were you able to ascertain what was going on from the conversation?
 {¶ 10} "A. Yes, I was.
 {¶ 11} "Q. And being they were both clearly upset, were you able to hear what your son was trying to say on the phone?
 {¶ 12} "A. Yes, I did hear him.
 {¶ 13} "Q. And what did he say?
 {¶ 14} "A. He said for Rick to tell the truth what was going on.
 {¶ 15} "Q. Do you recall what Rick said? *Page 4 
 {¶ 16} "A. Rick said he was mad Jack wouldn't mow the lawn." Trial Transcript at 235.
 {¶ 17} Southall testified that she thought the two were arguing about mowing the lawn. According to Southall, after the telephone call, Jack's behavior changed and he did not he did not want to do things with the family. Southall and appellant got a dissolution of their marriage in October of 1994.[1]
 {¶ 18} On cross-examination, Southall testified that she had a daughter, Chelsea, with appellant who was born in February of 1992 and that she worked until two weeks before her delivery date. She further testified that she was home with her son Jack when he was not in school during those two weeks and that he confided most things in her. When questioned, Southall admitted that Jack never told her during such time that appellant was bothering him. She also testified that she took Jack to the YMCA sometimes with her and that he was on the swim team there. She testified that Jack had continual contact with teammates, coaches, doctors and friends during the relevant periods of time and that no one ever reported to her that they thought something was wrong with Jack.
 {¶ 19} On cross-examination, Southall also testified that when she questioned Jack about the telephone call she had received at work, he did not tell her about any alleged improper sexual conduct.
 {¶ 20} At trial, Jack Gardner testified that he was very athletic as a child and that he had played for the Canton Mighty Mites Boys Club Baseball League. He testified that appellant was a coach for the Mighty Mites and that, after appellant married Gardner's *Page 5 
mother, appellant filled a void because Gardner's father was out of the picture. According to Gardner, appellant took him fishing and played baseball and softball with him. Gardner testified that the two "did everything together" and that he believed that appellant "was going to be my dad." Trial Transcript at 287, 292.
 {¶ 21} Gardner testified that his relationship with appellant became sexual in nature. The following testimony was adduced when he was asked if he could remember how the sexual relationship started:
 {¶ 22} "A. Yeah. We were sitting upstairs on Roslyn. He asked me if I wanted to make some money. And I said well, what are you talking about making some money. And he just continued, like pulled out his penis and started playing with himself, ejaculating himself and asked if I can give him a hand.
 {¶ 23} "Q. And at that time did you know what he meant when he said give him a hand?
 {¶ 24} "A. I kind of did. But, you know, kind of iffy iffy on the situation." Trial Transcript at 288.
 {¶ 25} Gardner testified that he then touched appellant's penis, although he was unsure if appellant ejaculated at that time. He further testified that the sexual conduct, which occurred when Cindy Southall was at work, progressed from hand jobs to oral sex. According to Gardner, appellant offered him money for oral sex and would sit on the edge of the bed with his pants down during the sexual encounters. Gardner testified that appellant ejaculated "[d]own on his stomach. He would lean back and go with it from there." Trial Transcript at 291. Gardner also testified that he spent the money he received, which ranged up to thirty dollars, at a Nickeldeon arcade at the mall. He *Page 6 
further testified that he hid the things that he bought with the money from his mother. Gardner never told anyone about the sexual encounters because he was embarrassed and did not want to lose appellant, who was the only man who had ever taken care of him because he did not know his own father.
 {¶ 26} According to Gardner, appellant attempted to stick his penis into Gardner's rectum, but it would not fit, so he gave up. Gardner testified that the sexual encounters occurred numerous times and approximately once a week. The following testimony was adduced after Gardner responded in the affirmative when asked whether he noticed anything unusual about appellant's penis while performing oral sex on him:
 {¶ 27} "Q. And when you noticed that there was something unusual about his penis, did you recall if his penis was erect at the time or not?
 {¶ 28} "A. Yes, it was.
 {¶ 29} "Q. And just to clarify, when you noticed this were you in the process of performing oral sex, was it during one of these —
 {¶ 30} "A. It was the beginning of oral sex and I seen it and he started making jokes about it.
 {¶ 31} "Q. What kind of jokes would he make about it?
 {¶ 32} "A. Well, he put a pen and stuff through it and look what I can do, ha, ha.
 {¶ 33} "Q. Why don't you tell us what you noticed was unusual?
 {¶ 34} "A. On the top of his penis right below his head about this far he has extra foreskin where he can stick things through it and go — you can take this and stick it through and I mean it's very plain as day, I mean you can't miss it." Trial Transcript at 295-296. *Page 7 
 {¶ 35} A drawing of appellant's penis that was prepared by Gardner was admitted at trial as State's Exhibit 5. When asked how the sexual encounters came to an end, Gardner testified that he "got tired of it" and that the two got into a fight during which Gardner pushed appellant down. Trial Transcript at 298. The relationship between the two ceased at that point and Gardner's mother later divorced appellant.
 {¶ 36} Gardner later told his girlfriend, Beth Mossberger, with whom he was living at the time of the trial, that he thought that he had been molested as a child. At the time, appellant was twenty-eight years old. He later spoke with Detective James Armstrong of the Canton Police Department.
 {¶ 37} On cross-examination, Gardner testified that he did not get on the phone or recall saying anything to his mother during the telephone call that appellant made to Cindy Southall while she was at work. Appellant further testified that he never told his mother about the sexual encounters because he did not want to lose appellant as a father. Appellant, when questioned about the money that he testified appellant paid him, stated that his mother did not know that he went to the arcade and spent money. He further testified that when initially contacted by Detective Armstrong, he denied that anything had occurred because he did not know that the Detective was going to call him and "didn't want to say anything" because he did not know who was on the phone. Trial Transcript at 317.
 {¶ 38} At trial, Dr. Darrell Steiner from Akron Children's Hospital testified that as director in the abuse unit, he was asked to examine photos of appellant's penis. Photos of appellant's penis were admitted at trial as State's Exhibits 6, 7 and 8. Dr. Steiner testified that appellant, due to a complication of circumcision, had an unusual hole in his *Page 8 
penis that would have been present since appellant was an infant. Testimony was adduced that the hole would get larger as the penis became erect and that a cylindrical type object could be inserted into the hole.
 {¶ 39} After the trial court denied appellant's Crim. R. 29 motion for judgment of acquittal, Chelsea Southall, the daughter of appellant and Cindy Southall, testified. Chelsea Southall testified that, contrary to Jack Gardner's testimony that he had had no contact with appellant since 1992 or 1993, Jack had kept in touch with appellant since the dissolution and would call him on holidays and birthdays. She further testified that he stopped over every now and then and that there was no tension between them. On cross-examination, she admitted that she had rarely spoken to her brother in the last five or ten years.
 {¶ 40} Appellant took the stand in his own defense and denied that he had sexually abused Jack Gardner or had Gardner perform oral sex on him. He further testified that Gardner had kept in contact with him and his side of the family and they went camping after the dissolution. When questioned about the phone call he made to Cindy Southall while she was at work, appellant testified that Gardner had been diagnosed with ADHD (Attention Deficit Hyperactivity Disorder), but was taken off of his medication in the summer of 1991. According to appellant, Gardner was mean and disrespectful when he was off of his medication.
 {¶ 41} On cross-examination, appellant admitted that he had a deformity in his penis. He further testified that his ex-wife had performed oral sex on him once. When, in response to a question from the jury, the trial court asked appellant how Jack Gardner would have known about the deformity, appellant indicated that he did not *Page 9 
know. In response to another question, appellant testified that he and Cindy Southall got a dissolution of their marriage due to money problems and because they argued a lot.
 {¶ 42} Mike Criswell and Rick Nelson, appellant's friends, testified at trial that they were involved in coaching with appellant and Jack Gardner and also socialized with appellant and his family. They testified that they did not notice any change in Jack's relationship with appellant.
 {¶ 43} The State later called Cindy Southall as a rebuttal witness. She testified she later found out that, during the marriage, appellant's mother gave him money. After she testified that the two got divorced after appellant threw her down when she was pregnant, appellant moved for a mistrial. The motion was denied and the trial court instructed the jury to disregard such statement. Cindy Southall also testified that she never had oral sex with appellant because appellant did not like to have sex with her and that she was unaware of the physical deformity in appellant's penis. Southall testified on cross-examination that, after she married appellant, the two had sex only five times in three years. She also testified that she went camping with appellant after the dissolution of their marriage.
 {¶ 44} At the conclusion of the evidence and the end of deliberations, the jury, on May 1, 2008, found appellant guilty of rape. Pursuant to an entry filed on May 9, 2008, appellant was sentenced to an indefinite prison term of ten (10) to twenty-five (25) years and ordered to pay a fine in the amount of $20,000.00.
 {¶ 45} Appellant now raises the following assignments of error on appeal: *Page 10 
 {¶ 46} "I. THE TRIAL COURT ERRED BY IMPROPERLY ADMITTING HEARSAY TESTIMONY.
 {¶ 47} "II. THE TRIAL COURT ERRED IN ADMITTING A PHOTOGRAPH, THE PROBATIVE VALUE OF WHICH WAS SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE.
 {¶ 48} "III. THE TRIAL COURT ERRED BY ADMITTING EVIDENCE OF AND ARGUMENT ABOUT `OTHER ACTS' PROHIBITED BY EVIDENCE RULE 404.
 {¶ 49} "IV. THE COURT ERRED IN IMPAIRING APPELLANT'S RIGHT TO CROSS EXAMINE WITNESSES.
 {¶ 50} "V. THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.
 {¶ 51} "VI. THE APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT."
 I {¶ 52} Appellant, in his first assignment of error, argues that the trial court erred by improperly admitting hearsay testimony.
 {¶ 53} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and is not admissible. Evid. R. 801(C) and 802.
 {¶ 54} Appellant, in his first assignment of error, initially challenges Cindy Southall's testimony that, during the summer of 1993, she received a telephone call from appellant while she was at work and that, during the telephone call, she heard her *Page 11 
son, who was on another extension, tell appellant "to tell the truth what was going on." Trial Transcript at 235. We note that there was no objection to such testimony. Accordingly, appellant has waived all but plain error in this regard. State v. Hill, 92 Ohio St.3d 191, 196,2001-Ohio-141, 749 N.E.2d 274, 279; Crim. R. 52(B). "Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. Plain error will not be found absent a showing by appellant that "but for the error, the outcome of the trial clearly would have been otherwise." State v. Williams,99 Ohio St.3d 439, 458, 2003-Ohio-4164, 793 N.E.2d 446, at paragraph 40, quotingLong, supra, at paragraph two of the syllabus.
 {¶ 55} We find that the alleged error does not rise to the level of plain error because we cannot say that, but for the alleged error, the outcome of the trial would have been different. There was overwhelming evidence of appellant's guilt. We note that, at the trial in this matter, Jack Gardner testified that, when he was a child, appellant molested him and had Gardner perform oral sex on him in exchange for money. Gardner further testified about an unusual abnormality on appellant's penis that he noticed while performing oral sex on appellant. There was testimony that the deformity became easily observable when appellant's penis was erect. From the photos of appellant's penis admitted at trial, it is apparent that the deformity is not as apparent when appellant's penis is flaccid. When asked how Gardner would have known about the abnormality, appellant had no explanation. Moreover, we further note that Gardner, during his own testimony, testified that he did not recall getting on the *Page 12 
phone during appellant's telephone call to Cindy Southall and did not recall saying anything to her during the same.
 {¶ 56} Appellant also challenges Beth Mossberger's testimony that, while she was eating lunch with Jack Gardner approximately two and a half years before trial, he started crying and stuttering. Mossberger testified that Gardner told her that he had to tell her something that he had never told anyone before and that she could not tell anyone else and had to "[g]o to the grave with the secret." Trial Transcript at 342. According to Mossberger, Gardner then told her that he thought that appellant had molested him when he was a child.
 {¶ 57} Appellant's counsel objected to Mossberger's testimony, arguing that it was hearsay. The trial court, however, overruled such objection, stating that "[w]e have had the testimony of Mr. Gardner as to what he said to [M]ossberger." Trial Transcript at 340.
 {¶ 58} We find that, assuming such testimony was hearsay, its admission was harmless. As noted by the trial court, Jack Gardner himself testified that he told Beth Mossberger, his girlfriend who was pregnant with his child at the time, that he thought he had been molested by appellant. Gardner was subject to cross-examination. In addition, as is stated above, there was overwhelming evidence of guilt.
 {¶ 59} Appellant's first assignment of error is, therefore, overruled.
 II {¶ 60} Appellant, in his second assignment of error, argues that the trial court erred in admitting, over objection, a photograph at trial because the probative value of the same was substantially outweighed by the danger of unfair prejudice. *Page 13 
 {¶ 61} Evid. R. 403(A) provides, in relevant part, as follows: "[although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The admission or exclusion of photographs under Evid. R. 403 is left to the sound discretion of the trial court. State v. Hill (1967), 12 Ohio St.2d 88,232 N.E.2d 394, paragraph two of the syllabus. An abuse of discretion means more than a mere error of law or an error in judgment. It implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. State v. Adams (1980), 62 Ohio St.2d 151, 404 N.E.2d 144.
 {¶ 62} Appellant specifically objected to admission of a photograph showing appellant with Jack Gardner. Appellant, in the photo, is wearing red athletic shorts, has his hands down his pants and is clowning around. Appellee argued that such photo was admissible because "[i]t's the only picture that the State has that is a picture of the two of them together engaged in any kind of not a staged photo . . . It has the period of time that has been authenticated, showing them beginning in the activities that were described." Transcript at 400-401.
 {¶ 63} Assuming, that it was error to admit such photo, we find such error harmless. As is stated above, there was overwhelming evidence of appellant's guilt.
 {¶ 64} Appellant's second assignment of error is, therefore, overruled.
 III {¶ 65} Appellant, in his third assignment of error, argues that the trial court erred by admitting evidence of, and argument about, other acts evidence in violation of Evid. R. 404. *Page 14 
 {¶ 66} Under Evid. R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith; [however,] it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 67} In the case sub judice, after appellant testified that he got divorced[2] from Cindy Southall for financial reasons, appellee called Cindy Southall as a rebuttal witness. Prior to Cindy Southall taking the stand again, the following discussion took place on the record:
 {¶ 68} "MS HARTNETT: So before I go there, I guess I wanted to clarify with the Court whether or not I would be able to elicit that and this goes directly to the issue of the reason for their divorce. The Defendant stated that it was financial. That was the question from the jury as to why they divorced. I know there's a lot of reasons that could be given, some of what I imagine would be I think probably too prejudicial. But I am asking if I am permitted to ask here whether or not the reason for their divorce was financial because she quite frankly will say no.
 {¶ 69} "And if I am permitted to ask her what the reason for the divorce was, because it has been brought out now. I won't elicit any specific incident, I mean there was some specific incidents. I won't ask for that.
 {¶ 70} "THE COURT: What do you anticipate her answer is going to be?
 {¶ 71} "MS HARTNETT: Well, it would be something along the lines, and I will I guess counsel her, that they had a lack of a sexual relationship, and quite frankly, it *Page 15 
became potentially abusive. They, you know, there was no sexual relationship, all the way to the day that he threatened to put the baby out in the back yard. I won't elicit that last one." Trial Transcript at 498-500.
 {¶ 72} When she took the stand on rebuttal, Cindy Southall testified that the two got divorced because appellant was "physical" with her and threw her down once when she was pregnant. Trial Transcript at 509. Appellant then moved for a mistrial, arguing that "they [the State] have elicited a specific instance which they told the Court they weren't' going to do." Trial Transcript at 509. The trial court denied appellant's motion for a mistrial, but instructed the jury "to disregard the last statement of the witness." Trial Transcript 510.
 {¶ 73} The jury is presumed to follow the instructions given by a trial judge, including instructions to disregard statements made during trial. State v. Garner (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623. There is no evidence that the jury disregarded the trial court's instructions to disregard Southall's above statements. Moreover, based on the totality of the evidence, we find that the outcome of the trial would not have been different had such statement not been made.
 {¶ 74} Appellant's third assignment of error is, therefore, overruled.
 IV {¶ 75} Appellant, in his fourth assignment of error, argues that the trial court erred in impairing appellant's right to cross-examine Cindy Southall, Jack Gardner's mother.
 {¶ 76} The trial court shall allow cross-examination "on all relevant matters and matters affecting credibility." Evid. R. 611(B). The scope of cross-examination lies within *Page 16 
the trial court's discretion. State v. Slagle (1992), 65 Ohio St.3d 597,605, 605 N.E.2d 916. This court will not reverse a trial court's ruling on the scope of cross-examination absent an abuse of that discretion. Id. An abuse of discretion suggests that a decision is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 77} Appellant specifically contends that the trial court erred when it prohibited defense counsel from impeaching Cindy Southall, after she testified on rebuttal that the reasons for her divorce from appellant were not financial and that he threw her down when she was pregnant, with extrinsic evidence on the reason for her divorce. Appellant sought to cross-examine Southall with the petition for dissolution of marriage which, appellant argues, "shows that the parties obtained a dissolution and she never claimed cruelty as a grounds for divorce."
 {¶ 78} The trial court, in preventing defense counsel from cross-examining Cindy Southall with the petition for dissolution, noted that the petition contained standard language. The following is an excerpt from the trial court's ruling:
 {¶ 79} "THE COURT: The petition for dissolution of marriage states in the separation agreement which is attached hereto as is the normal practice together with an affidavit states that paragraph one of the affidavit affiants are married to each other having counseled insoluble differences wish to legally separate, then it goes on. Then separation agreement paragraph two states quote differences have arisen between the parties and they are now living separately and apart. Desire to by these presence take whatever settlement and determine and divide their perspective obligations to each other and to record such understanding as to a division of property. *Page 17 
 {¶ 80} "The Court finds that these documents do not bring any other information. This is the standard language which is used in the petition to dissolve a marriage and we have these two people here and they are the ones who are most involved in this, have the best knowledge of it. That's the Court's ruling." Trial Transcript at 514-515.
 {¶ 81} The trial court further noted that such language was used "regardless of whether the people were at each other's throats or not." Trial Transcript at 516.
 {¶ 82} We find that the trial court did not abuse its discretion in prohibiting defense counsel from cross-examining Cindy Southall with the dissolution petition because such decision was not arbitrary, unconscionable or unreasonable. As noted by the trial court, the no-fault language used in the petition was standardized language that was often used regardless of the real reason for a dissolution. Moreover, the trial court did allow defense counsel to question Cindy Southall about the dissolution. Defense counsel questioned her about her income at the time of the dissolution, appellant's income at such time and other financial matters. Finally, as noted by appellee and as discussed in the third assignment of error, after Southall testified that she divorced appellant because he pushed her down the stairs, the jury was instructed to disregard such testimony. The jury is presumed to follow such instruction.
 {¶ 83} Appellant's fourth assignment of error is, therefore, overruled.
 IV {¶ 84} Appellant, in his fifth assignment of error, argues that his conviction for rape is against the manifest weight and sufficiency of the evidence. We disagree.
 {¶ 85} In State v. Jenks (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, superseded by constitutional amendment on other grounds in State v.Smith, 80 Ohio St.3d 89, *Page 18 1997-Ohio-355, 684 N.E.2d 668, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
at paragraph two of the syllabus.
 {¶ 86} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N .E.2d 541 superseded by constitutional amendment on other grounds as stated by State v. Smith,80 Ohio St.3d 89, 1997-Ohio-355, 684 N .E.2d 668, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1. *Page 19 
 {¶ 87} Appellant, in the case sub judice, was convicted of rape in violation of R.C. 2907.02(A)(1(b). Such section states as follows: "(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies: . . . (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person."
 {¶ 88} In essence, appellant argues that the only witness to the alleged rape was Jack Gardner, who was twelve years old at the time. Appellant contends that Gardner was not a credible witness because, despite his testimony that he used the money he claims to have received from performing oral sex on appellant to make large purchases, no one ever remembered Gardner having extra money or making any such purchases. Appellant also points out that Jack Gardner denied that he was ever on the phone during the telephone call that appellant made to Cindy Southall while she was at work, and that, at the time of this call, Jack Gardner was being treated for ADHD and was not taking his medication, causing him to misbehave. Appellant also notes that while Cindy Southall testified that her son was close to and confided in her, Jack never told her about the abuse.
 {¶ 89} In addition, appellant also notes that Jack Gardner originally denied the abuse when first contacted by police and that, although Jack had contact with counselors, teachers, doctors and coaches throughout the period of the alleged abuse, no one ever suspected any abuse or noticed any change in Jack's behavior. Moreover, appellant also notes that there was testimony adduced at trial that Jack Gardner continuing having contact with appellant after appellant moved out. *Page 20 
 {¶ 90} However, the jury, as trier of fact, was in the best position to assess Jack Gardner's testimony and clearly found him a credible witness. Moreover, there was testimony at trial that appellant had a rare abnormality in his penis that became apparent when his penis was erect. The photos admitted at trial as State's Exhibits 6-8 show that when his penis is not erect, the abnormality is not readily apparent. When questioned about how Jack Gardner knew about such abnormality, appellant was unable to provide an explanation.
 {¶ 91} In short, we find that, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that appellant engaged in sexual conduct with Jack Gardner, who was less than thirteen years old at the time. We find, therefore, that appellant's conviction is not against the sufficiency of the evidence. We further find that the jury did not lose its way so as to create a manifest miscarriage of justice in convicting appellant of rape. Appellant's conviction, therefore, was not against the manifest weight of the evidence.
 {¶ 92} Appellant's fifth assignment of error is, therefore, overruled.
 VI {¶ 93} Appellant, in his sixth assignment of error, contends that he was denied his right to a fair trial due to prosecutorial misconduct.
 {¶ 94} Prosecutorial misconduct will not provide the basis for reversal unless it can be said that the misconduct deprived the appellant of a fair trial based on the entire record. State v.Peterson, Cuyahoga App. No. 88248, 2007-Ohio-1837; State v. Lott (1990),51 Ohio St.3d 160, 174, 555 N.E.2d 293. "The touchstone of the analysis `is the fairness of the trial, not the culpability of the prosecutor.'"State v. Gapen, *Page 21 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, at paragraph 92, quotingSmith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940,71 L.Ed.2d 78.
 {¶ 95} Appellant initially contends that the prosecutor engaged in misconduct when, during voir dire, the prosecutor attempted to question jurors about the reasons for the delay in the indictment or the disclosure of the alleged crime.[3] Appellant argues that, prior to voir dire, the trial court instructed counsel that they could not question the jurors about the same.
 {¶ 96} Prior to voir dire, the trial court instructed counsel that they could "ask the question if anyone has a problem with delayed disclosure, . . ." Trial Transcript at 46. The trial court further instructed counsel that they could not question jurors about the reason for the delay. During voir dire, the following discussion took place between the prosecutor and one of the jurors:
 {¶ 97} "MS. HARTNETT: Anybody who feels differently? What about the fact that is doesn't always get reported? Accept that fact? Sometimes it never does. Sometimes it gets reported at different times much later. Anyone who would have difficulty accepting that fact?
 {¶ 98} "Anyone who feels that it would make it less likely that it occurred given the length of time that passed? No one? Juror 103, you don't have a problem with that?
 {¶ 99} "JUROR NO. 103: No.
 {¶ 100} "MS. HARTNETT: Juror 103, in your mind can you think of reasons why that might be?
 {¶ 101} "MR. JAKMIDES: Objection, Your Honor. *Page 22 
 {¶ 102} "THE COURT: Sustained. Let's move on.
 {¶ 103} "MS. HARTNETT: I will, Your Honor. You said it is not a problem. You can accept the fact that sometimes it —
 {¶ 104} "MR. JAKMIDES: Same objection, Your Honor.
 {¶ 105} "THE COURT: I will allow that, but let's move on." Trial Transcript at 134-135.
 {¶ 106} We find, from the foregoing, that when the prosecutor attempted to question jurors about the reason for the delay, appellant's objections were sustained by the trial court. Appellant therefore, was not prejudiced. Moreover, there is nothing in the record supporting appellant's allegation that, during voir dire, the juror was questioned about the delay in the indictment.
 {¶ 107} Appellant next maintains that the prosecution engaged in misconduct when, during examination of the State's first witness, the prosecutor attempted to show the witness a photograph that had been excluded by the court only minutes before. The photograph at issue was State's exhibit 4, the photograph that showed appellant and Jack Gardner. After appellant objected to the admission of such photograph because it showed him with his hands down his pants, the trial court told the prosecution that it was not permitted "to display 4 at this time." Transcript at 230. Immediately thereafter, the prosecutor handed Cindy Southall a number of photographs, which included photograph 4, and, before Southall could testify about such photo, the trial court instructed the prosecution to "keep 4 back." Trial Transcript at 231. We find, based on the trial court's actions in instructing the prosecution to keep such photograph *Page 23 
back at that time, there was no prejudice. The photograph, which was later introduced at trial, was not displayed to the jury at such time.
 {¶ 108} Appellant next complains that, while cross-examining the State's first witness, the prosecutor was making gestures with her hands that were distracting to the jury. When asked by defense counsel, who did not see what the prosecutor did, to describe the gestures for the record, the trial court stated that "she moved her hands rapidly from her side up and then down, so I saw it." Trial Transcript at 259. The trial court then admonished the prosecutor for making such gestures and instructed her not to make them anymore. There is no evidence that appellant was prejudiced by the gestures. We cannot say that the outcome of appellant's trial could have been different had such gestures not been made.
 {¶ 109} Next, appellant asserts that the prosecutor engaged in misconduct in calling Cindy Southall as a rebuttal witness to dispute appellant's testimony that the two got a dissolution for financial reasons. When asked, prior to Southall taking the stand on rebuttal, what she anticipated Southall would say when asked the reason for the divorce, the prosecutor stated that "it would be something along the lines . . . that they had a lack of a sexual relationship." Trial Transcript at 499. When asked the reason for the dissolution, Cindy Southall testified that appellant had been abusive to her and had thrown her down when she was pregnant. Appellant's request for a mistrial was denied. We note that, as is stated above, the jury was instructed to disregard such statement and is presumed to follow such instruction. Moreover, based on the overwhelming evidence of guilt, we cannot say that appellant was prejudiced. *Page 24 
 {¶ 110} The next alleged instance of prosecutorial misconduct occurred after appellant called David Miday, the executive of the J. Babe Stearn Community Center, as a character witness regarding appellant's reputation for truthfulness. Miday testified that, in his capacity as director, he knew appellant and held him in the highest regard. On cross-examination, Miday admitted that appellant had worked for or through the community center as a coach. After Miday was questioned on cross-examination about whether he "would have potential liability concerns on your hands as the director" if appellant was convicted, defense counsel objected. Trial Transcript at 532. The court sustained the objection and instructed the jury to disregard the last question. After the prosecutor then asked Miday if appellant had been suspended during the pendency of "all of this," Miday responded as follows: "Yes. I think that was your wishes what was told to me." Trial Transcript at 533. At the prosecutor's request, such answer was stricken as unresponsive and the jury was instructed to disregard the same. Assuming, arguendo, that the prosecutor acted improperly, we cannot say that the outcome of the trial would have been any different because there existed strong evidence of guilt. We note that the trial court asked defense counsel if he was moving for a mistrial and defense counsel indicated that he was not.
 {¶ 111} Finally, appellant argues that the prosecutor engaged in misconduct during closing arguments. Appellant specifically points to the following comments made by the prosecutor during closing arguments: "Proof beyond a reasonable doubt . . . Proof of such character that you would be willing to rely and act upon it in the most important of your affairs, your own children, your own grandchildren. Ask yourself if after hearing *Page 25 
this evidence would you allow those children to be alone with this Defendant?" Trial Transcript at 581-582.
 {¶ 112} Appellee, in its brief, concedes that such statement "may have been improper." We find that such statement was, in fact, improper. As noted by this Court in State v. Roberson (June 23, 1982), Stark App. No. 5828, 1982 WL 5451, "`It has been recognized in many cases that arguments by counsel suggesting to the jurors that they place themselves in the position of a party to the cause . . . are usually improper, and reversibly erroneous.'
 {¶ 113} "75 Am. Jur. 2d, Section 282, p. 358.
 {¶ 114} "The `golden rule' technique of argument to a jury runs afoul of this clear limitation upon the right of the attorney to comment upon the evidence as opposed to appealing to the passion or sympathy of the jury. `Do unto others as you would do unto me' carries an improper implication in final argument." Id at 2.
 {¶ 115} Generally, a "golden rule" argument is improper. However, a "golden rule" comment during closing argument is not per se prejudicial so as to warrant a new trial. See Dillon v. Bundy (1991),72 Ohio App.3d 767, 775, 596 N.E.2d 500. Moreover, considerable latitude is permitted in closing argument. State v. Maurer (1984), 15 Ohio St.3d 239, 269,473 N.E.2d 768. The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. State v.Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883; State v. Lott
(1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293.
 {¶ 116} However, viewing the above comments in the context of the entire trial, it appears beyond a reasonable doubt that the jury would have found appellant guilty *Page 26 
even without the improper comment. As is stated above, testimony was adduced at trial that appellant has a rare abnormality of the penis that becomes apparent when his penis is erect. When questioned about how Jack Gardner knew of such abnormality, appellant was unable to provide any explanation. Moreover, the jurors were instructed that closing arguments are not evidence. In short, we find that appellant was not denied a fair trial by the prosecutor's comments during closing arguments.
 {¶ 117} Appellant's sixth assignment of error is, therefore, overruled.
 {¶ 118} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.
 Edwards, J., Farmer, P.J., and Gwin, J. concur. *Page 27 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Throughout the trial, although the parties obtained a dissolution of their marriage, the terms divorce and dissolution were both used.
[2] As is stated above, the two actually obtained a dissolution of their marriage, but throughout the trial in this matter, the dissolution was referred to as a divorce.
[3] While the alleged rape occurred in 1991 or 1992, the indictment was not filed until September of 2007. *Page 1